STATE OF NORTH CAROLINA v. ROBERT LEE WEST

No. 213A85

(Filed 2 July 1986)

1. **Criminal Law § 82— priest-penitent privilege not applicable—defendant not seeking counsel of minister—conversation not confidential**

    A preacher was not incompetent to testify under North Carolina's codification of the priest-penitent privilege where the evidence suggested that the preacher sought out defendant and their conversation was held in the presence of the preacher's wife. N.C.G.S. § 8-53.2 (1981), N.C.G.S. § 15A-1443(a) (1983).

2. **Rape and Allied Offenses § 4.1— first degree rape and sexual offense—admission of purchase of pornographic materials and ladies' underwear—no prejudice**

    In a prosecution for first degree rape and first degree sexual offense against defendant's stepdaughter, there was no prejudicial error in the admission of defendant's admission to his preacher of the purchase of pornographic material and ladies' underwear. Defendant neither objected nor moved to strike the remark at trial and, even if it was arguably irrelevant, the error was not of so fundamental a nature that defendant was deprived of a fair trial.

3. **Criminal Law § 85.2— rape—minister's statement that defendant sick—nonprejudicial**

    The trial court did not err in a prosecution for first degree sexual offense and first degree rape by admitting statements by defendant's preacher that defendant was sick and needed help. The context of the preacher's remarks did not indicate that he was relying exclusively on statements by defendant's stepdaughter, the victim; the use of the word sick in describing defendant's behavior was colloquial, indicating the speaker's perception of defendant's lack of moral equilibrium; and there was no reasonable possibility that a different result could have been obtained had the remarks been excluded.

**4. Criminal Law § 75.1— rape investigation focused on defendant—officers called on defendant at home—no arrest warrant or charge—inculpatory statement admissible**

An inculpatory statement made by defendant to officers in a prosecution for first degree rape and first degree sexual offense was admissible where deputies called defendant at home and said they would like to talk with him; defendant agreed and deputies arrived at his home about twenty minutes later; the three officers identified themselves and defendant invited them into the living room; a deputy told defendant that his stepdaughter and her mother had made certain allegations against him and said that they wished to hear his side; defendant asked whether anything he said could be used against him and was told that it could; defendant asked what the allegations were and, once informed, admitted that they were true; the Sheriff Department's investigation had already centered on defendant but deputies did not yet have a warrant when they went to interview him; *Miranda* warnings were not issued; defendant was told that warrants would be drawn in light of what his stepdaughter, her mother and defendant had told deputies; defendant was asked if he would like to accompany officers back to the courthouse and defendant asked officers to come back later; and officers returned at a later time with a warrant and issued *Miranda* warnings. Although the investigation had focused on defendant, defendant had not been charged, a warrant had not been issued, and the officers' conversation with defendant in the familiarity and convenience of his own living room was not equivalent to the compelling atmosphere of a custodial interrogation.

**5. Criminal Law § 70— tape recording found close to defendant's house admissible**

The trial court did not err by admitting into evidence in a prosecution for first degree rape and first degree sexual offense the contents of a tape recording found less than a mile from defendant's house in which a voice identified by the victim and her mother as defendant described a sexual fantasy involving the victim and included the remark that the speaker had been having sexual relations with the victim since she was eleven. Defendant objected at trial only on the basis of chain of custody and voice identification, not on Rule 401 or 404 grounds; the trial court's findings regarding chain of custody were sufficient; defendant's wife, his stepdaughter, and the deputy who interviewed him were all sufficiently familiar with his voice to make an identification; the tape's contents corroborated their identification testimony; and there was no question that the contents of the tape were relevant to the offenses for which defendant was tried. N.C.G.S. § 8C-1, Rules 401 and 404.

APPEAL by defendant from judgments entered by *Ellis, J.*, at the 13 November 1984 session of Superior Court, SCOTLAND County. Defendant was convicted of rape in the first degree and sexual offense in the first degree. From the judgments of life imprisonment, defendant appeals as a matter of right pursuant to N.C.G.S. § 7A-27(a). Heard in the Supreme Court 13 May 1986.

*Lacy H. Thornburg, Attorney General, by David Roy Black-well, Assistant Attorney General, for the state.*

*Gordon Widenhouse for defendant.*

MARTIN, Justice.

We find no error in defendant's trial and sentences.

Defendant was indicted on charges of rape in the first degree and sexual offense in the first degree. The charges stemmed from the allegations of Kimberly Ann Hayes, defendant's stepdaughter. Kimberly testified that on the morning of 16 April 1984, she missed the school bus and decided to skip school. Her mother had already left for work. She heard a door open and close at the back of the house, then saw defendant standing in the hallway. She ran to her bedroom and locked the door. Hearing defendant try the door, she opened the window and ran out into the yard. Defendant came out the front door into the yard, told Kimberly to come back into the house, and moved towards her. She refused, walking away towards a neighbor's house. She rang the neighbor's doorbell and was admitted. The neighbor, who could see that Kimberly was cold, shaking, and upset asked her what was wrong, and Kimberly replied that she couldn't take it any more and, when pressed for details, stated that defendant had been raping her over the course of several years. At Kimberly's request, the neighbor drove her to the parsonage of Kimberly's family church in McColl, S.C., where Kimberly told the preacher and his wife what had happened. The preacher's wife in turn told Kimberly's mother, and Kim and her mother notified the sheriff's department.

Kimberly's testimony about defendant's past attacks on her included in particular an incident occurring on the morning of 23 November 1981, when she was eleven years old. She was home from school with a cold, and defendant came into her room where she had been sleeping, carried her, kicking and screaming, to his bedroom, threw her on the bed, pulled a large chest in front of the door, disrobed her, then engaged in cunnilingus and intercourse with her. Similar incidents recurred several times over the succeeding years; but defendant threatened to hurt Kimberly and her mother if she ever told anyone, and, until the spring of 1984, fear and guilt compelled Kimberly's compliance. Shortly prior to

the 16 April incident, however, following an argument with her mother, Kimberly told a friend about defendant's attacks. Then, on the morning of the sixteenth, her encounter with defendant at home precipitated the allegations giving rise to defendant's trial on charges of rape in the first degree and sexual offense in the first degree. Defendant was found guilty of both offenses and sentenced to imprisonment for two consecutive life terms.

In this appeal, defendant assigns error to the admission into evidence of certain information elicited from three sources other than Kimberly's testimony, to wit:

Reverend Black, the preacher at the McColl Church of God, testified that he met with defendant at the parsonage on April 17, the day after Kimberly had run to her neighbor for help. The preacher's wife was also present. Reverend Black testified that he talked to defendant about Kimberly's accusations, to which defendant responded that he was guilty and that he knew he had "done wrong." Defendant elaborated on his sexual desires, telling the preacher that he had had intercourse with Kimberly from when she was around nine years old, that he would just go into a "rage," and that he had bought pornographic literature and women's underwear.

[1] Defendant assigns error to three aspects of Reverend Black's testimony. First, defendant argues that the preacher was incompetent to testify under North Carolina's codification of the priest-penitent privilege, which provides:

No priest, rabbi, accredited Christian Science practitioner, or a clergyman or ordained minister of an established church shall be competent to testify in any action, suit or proceeding concerning any information which was communicated to him and entrusted to him in his professional capacity, and necessary to enable him to discharge the functions of his office according to the usual course of his practice or discipline, wherein such person so communicating such information about himself or another is seeking spiritual counsel and advice relative to and growing out of the information so imparted, provided, however, that this section shall not apply where communicant in open court waives the privilege conferred.

N.C.G.S. § 8-53.2 (1981). The wording of the statute suggests two requisites that are not met under the facts of this case: one is that the defendant be *seeking* the counsel and advice of his minister; the other is that the information be *entrusted* to the minister —that the communication be *confidential.*

Prior to 1967, when the current provisions were enacted, the statute (chapter 646 of the 1959 North Carolina Session Laws) defined privileged information as that which may have been "confidentially communicated." The legislature's excision of the term "confidential" from the current version of this statute was clearly not intended to broaden application of the privilege to all genre of general conversation with one's spiritual mentor, but merely to broaden the range of advisory and counseling practices to which it applies. We conclude that the expectation of trust and confidentiality inherent in communications covered under the prior statute was not affected by the legislature's modification in 1967 of that statute's wording.

There is no indication from the evidence before the trial court that defendant sought the counsel of Reverend Black. Rather, the evidence suggests that the preacher, who had told defendant's wife the day before that defendant "need[ed] help" and that he "was going to try to help him," had sought out *defendant* for that purpose. Nor was the meeting, attended as it was by defendant, Reverend Black, *and* the latter's wife, one in which defendant had any reason to expect confidentiality. The conversation between defendant and Reverend Black, held as it was in the presence of Mrs. Black, appeared to be one in which the preacher was offering his advice and counsel, but it was not one in which defendant's admissions were *entrusted* to Reverend Black in pursuit of such counsel and advice. We hold that, under these circumstances, N.C.G.S. § 8-53.2 does not apply.

[2] Second, defendant contends that the preacher's testimony of defendant's admitting to the purchase of pornographic material and ladies' underwear was irrelevant and prejudicial. Defendant argues that this testimony should have been excluded under the authority of Rule 403 of the North Carolina Rules of Evidence, because any probative value was outweighed by the danger of unfair prejudice. The record reflects that defendant neither objected to nor moved to strike this remark at trial. He has therefore

waived his right to assert this alleged error on appeal. N.C.G.S. § 15A-1446(b) (1983); N.C.R. App. P. 10(b)(1).[1]

We see no reason in the interests of justice to disturb the verdict in this case based upon the admission of this testimony. Defendant's telling the preacher of his purchasing habits was an admission, and admissions are competent evidence when not barred by an exclusionary statute or rule and when they are relevant. 2 Brandis on North Carolina Evidence § 167 (1982). So long as it is at all probative, the question whether an admission is prejudicial is immaterial. Apropos, the words of Justice (later Chief Justice) Ruffin, written over one hundred and fifty years ago, are still current:

> The rule is universal that whatever a party says or does shall be in evidence against him, to be left to the jury. It is competent evidence. The jury can and will give it its due weight, according to the manner of obtaining the confession or the relative interests of him whose admissions are proved. I know of no solitary exception to this rule and cannot imagine one.

*McRainey v. Clark*, 4 N.C. 698, 699 (1818).

Even if it was arguably error on relevance grounds to admit this portion of the preacher's testimony, it was not one of "such fundamental nature that . . . defendant has been deprived of a fair trial." *State v. Black*, 308 N.C. 736, 745, 303 S.E. 2d 804, 809 (1983) (Martin, J., concurring). Nor was it so egregious or manifestly prejudicial that there was a reasonable possibility that a different result would have obtained. N.C.G.S. § 15A-1443(a) (1983). The weighing of such evidence was properly left to the jury.

---

1. Defendant contends that, because this conversation was privileged and because the priest-penitent privilege statute arguably makes this evidence inadmissible in light of a significant public policy, an objection is deemed taken as a matter of law. 1 Brandis on North Carolina Evidence § 27 (1982). Given our analysis of the inapplicability of the priest-penitent privilege to the facts of this case, we reject this reasoning. In addition, we remind defendant of Brandis's highly critical attitude towards this exception, indicated in a footnote to the very passage cited by defendant, including Brandis's conclusion that "there is no satisfactory answer [to the scope of the exception] except complete repudiation of the rule." 1 Brandis on North Carolina Evidence § 27, at 100 n.82.

[3]   Third, the trial court permitted Reverend Black to testify that, after he had heard Kimberly's account of how defendant had treated her, he had told Mrs. West "that Bob need[ed] to get help; that he was sick," and that "he need[ed] help and I was going to try to help him." Defendant objects that these remarks do not qualify under N.C.R. Evid. 701 as admissible lay opinion based on a rational perception of the witness that is materially helpful to the jury. Defendant argues that Reverend Black's characteriza-tion of defendant's behavior was based not upon his own percep-tion of that behavior, but upon Kimberly's accusations and that, instead of being helpful to the jury, such remarks engender preju-dice.

The context of Reverend Black's remarks to Mrs. West, how-ever, does not indicate that Reverend Black necessarily or ex-clusively relied on what the victim had to say; rather, the facts that Reverend Black had known defendant for several months and that he had seen him regularly at church services gave the depth of his own experience to what he had more recently been told. In addition, these remarks aided the jury in understanding the wit-ness and why he met with defendant the following day.

Reverend Black's use of the word "sick" in describing defend-ant's behavior was not an expert's term of art — it did not signify that the preacher was any better qualified than the jury to draw inferences from the facts. *See* 1 Brandis on North Carolina Evi-dence § 132 (1982). It was not meant to indicate the preacher's opinion that defendant was physically or emotionally sick, as the same testimony by a physician or psychiatrist would have done. The preacher's use of that term was colloquial. Given the identity of the speaker, it indicated his personal perception of defendant's lack of moral equilibrium, a perception based at least in part upon his own acquaintance with defendant. Even assuming arguendo that the preacher's remarks were based solely upon what Kimber-ly had told him, it was not prejudicial error to admit those remarks: there is no reasonable possibility that a different result would have obtained had they been excluded. N.C.G.S. § 15A-1443(a) (1983); *State v. Jordan*, 305 N.C. 274, 287 S.E. 2d 827 (1982). The weight of the evidence against defendant — not only from Kimberly's testimony but from defendant's own admissions — assures us that these remarks by Reverend Black did not con-

tribute to defendant's conviction. *State v. Milby*, 302 N.C. 137, 273 S.E. 2d 716 (1981).

[4]    Defendant also assigns error to the trial court's failure to bar evidence derived from a second source: his admission of guilt made to officers in what defendant contends was a custodial interrogation, in violation of his constitutional rights as protected by *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966). Garland Patterson, the deputy sheriff who had interviewed Kimberly and her mother, testified for the state that on 19 April he called defendant at home, identified himself as a detective with the Scotland County Sheriff's Department, and told defendant he would like to come over and talk to him. The latter was agreeable, and, about twenty minutes later, Patterson arrived with two other officers. The three identified themselves as police officers, and defendant invited them into the living room. Patterson told defendant that Kimberly and her mother had made certain allegations against him and said that they wished to hear his side. Defendant asked whether anything he said could be used against him in court and was told that it could. He then asked what the allegations were and, once informed, admitted that they were true.

Patterson testified on voir dire that the department's investigation had already centered on defendant when the officers went to interview him, but that they did not yet have an arrest warrant. *Miranda* warnings were not issued. Patterson told defendant that in light of what Kimberly, her mother, and defendant himself had told him, warrants would be drawn, and he asked defendant if he would like to accompany the officers back to the courthouse. Defendant replied that he would like to fix something to eat and call his mother and asked the officers to come back later if they could. The officers made an appointment to return at seven o'clock in the evening, which they did, serving a warrant and issuing *Miranda* warnings at that time.

The trial court concluded that none of defendant's constitutional rights had been infringed by this interview: there were no promises, offers of reward or inducements made by the officers in return for a statement or the lack of one; defendant had not been in custody, but in the privacy and freedom of his own home; and defendant's statement had been made freely, voluntarily, and understandingly.

We agree with the conclusions of the trial court. A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 444, 16 L.Ed. 2d at 706. In *Miranda*, the United States Supreme Court recognized the critical difference between interrogation at police headquarters and questioning in the home of the defendant. Stressing the psychological influence of the interview's physical surroundings, that Court quoted the following from a criminal investigation text: "In his own home, he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support." *Id.* at 449-50, 16 L.Ed. 2d at 709.

Aware as we are of the psychological influence of the interview's milieu, we do not consider the officers' conversation with defendant in the familiarity and convenience of defendant's own living room to have been equivalent to the "compelling atmosphere" of a custodial interrogation, which would render a confession without *Miranda* warnings involuntary. *See, e.g., State v. Gladden*, 279 N.C. 566, 184 S.E. 2d 249 (1971). Our view is reinforced by the fact that the officers subsequently left, permitting defendant to exercise his freedom even more fully.

Although, by the time they arrived at defendant's door, the officers' investigation had focused on him, defendant had not been charged. No warrant had been issued; he was not under arrest. The commandments of *Miranda* do not apply in situations "where the defendant has available the easier and more effective method of invoking the [Fifth Amendment] privilege simply by leaving," *State v. Davis*, 305 N.C. 400, 418, 290 S.E. 2d 574, 585 (1982), or, under the circumstances of this case, simply by refusing to admit the officers or by asking them to leave. Such action might have been rude, but the constraints of etiquette are not tantamount to custody.

The facts before us are not significantly different from those in *Gladden*, 279 N.C. 566, 184 S.E. 2d 249, in which the defendant called the police, then invited an officer into her home in order to explain what had happened. This Court held that, under the cir-

cumstances of that case, there was no indication that defendant was in custody or had otherwise been deprived of her freedom prior to or during her conversation with the officer, nor was there any indication that at that time she had been charged with any criminal offense. Because defendant West's freedom was not restricted in any significant way, we hold that his statement was "given freely and voluntarily without any compelling influences," and as such, it was admissible in evidence. *Miranda*, 384 U.S. at 478, 16 L.Ed. 2d at 726.

[5] Finally, defendant objects to the admission into evidence of the contents of a tape recording found by the side of the road within a mile of his house. The voice on the tape was identified by both Kimberly and her mother as being that of defendant. The voice described a sexual fantasy in which Kimberly was assaulted by several men, and it included the remark, "I've been f— her since she was eleven." Defendant's present objections to the tape rest generally upon the asserted irrelevance of its contents. N.C. R. Evid. 401. In addition, defendant opines, citing Rule 404, the tape impermissibly serves to show defendant's propensity to commit the offenses charged by illustrating his bad character, but does not fit within the exception to this rule permitting the admission of such evidence for purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment, or accident." N.C.R. Evid. 404(b).

At trial, however, defendant objected specifically not on Rule 401 or 404 grounds but on the basis of chain of custody and voice identification.[2] These grounds have not been reiterated in his appeal. It is a well-recognized rule that:

---

2. Defendant's assignments of error indicate that he twice subsequently objected generally to the admission of the tape into evidence. Although N.C.R. Evid. 103 requires no particular form for objections in order to preserve the alleged error on appeal, it does require that the alleged error be "clearly presented" to the trial court. N.C.R. Evid. 103(a)(1). The function of an objection is not only to signify that there is an issue of law, but also "to give notice of the terms of its issue." 1 Wigmore, *Evidence* § 18 (Tillers rev. 1983). Defendant cited no new terms for issuing his second and third objections, and the trial court would surely have been justified in assuming that defendant reiterated his objection based upon the grounds originally specified. In addition, no other grounds for an objection were obvious at that point in the trial record—least of all irrelevance and objectionable prejudice.

A specific objection, if overruled, will be effective only to the extent of the grounds specified. It makes no difference that there was another ground which would have been valid, unless there is no purpose at all for which the evidence would have been admissible.

1 Brandis on North Carolina Evidence § 27 (1982). In addition, Rule 28(b)(5) of the North Carolina Rules of Appellate Procedure deems as abandoned exceptions "in support of which no reason or argument is stated or authority cited." Taken together and applied to the record before us, these rules bar consideration on appeal of grounds not specifically cited as part of the objection as well as consideration on appeal of grounds specifically cited but not briefed. In short, "[the] theory upon which a case is tried in the lower court must control in construing the record and determining the validity of the exceptions." *State v. Hunter*, 305 N.C. 106, 112, 286 S.E. 2d 535, 539 (1982).

Even if this Court were to overlook the effect of these rules of disallowing the assertion of new grounds on appeal, defendant's objection that the contents of the tape were inadmissible is without merit. This is not a situation where a third person has learned of and reiterates examples of the defendant's behavior which indicate his bad character, calling into play the constraints of Rule 404. *See, e.g., State v. Shane*, 304 N.C. 643, 285 S.E. 2d 813 (1982) (former supervisor's testimony that defendant had admitted to committing fellatio with a prostitute held inadmissible because not relevant to offense in case at bar). Nor is it analogous to situations where the defendant is being cross-examined concerning specific acts of criminal and degrading conduct for purposes of impeachment. *See* 1 Brandis on North Carolina Evidence § 111. And *see, e.g., State v. Jean*, 310 N.C. 157, 311 S.E. 2d 266 (1984) (defendant admitted on cross that he had watched pornographic movies depicting acts of sexually deviant behavior); *State v. Gurley*, 283 N.C. 541, 196 S.E. 2d 725 (1973) (defendant properly cross-examined about possession of, familiarity with, and interest in pornographic magazines).

Properly authenticated,[3] the contents of the tape comprise an admission, which, as we noted before, is competent evidence and

3. N.C.R. Evid. 901(a) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient

as to which objections based upon prejudicial effect are misplaced. We are satisfied with the trial court's findings regarding chain of custody, and we agree with the trial court's judgment that Mrs. West, Kimberly, and the deputy sheriff who interviewed defendant were all sufficiently familiar with defendant's voice to enable them to identify his voice on the recording. In addition, the tape's contents corroborate this identification testimony: the speaker mentions Kimberly's name and age and fantasizes about what he would like to do "sometime when I know she's home by herself and her mama is gonna be at that plant . . . ." There can be no question that the tape's contents, including as they do defendant's admission of intercourse since Kimberly was eleven, are relevant to the offenses with which he was charged and tried. Accordingly, we hold that the contents of the tape were properly admitted into evidence.

In conclusion, we hold that none of defendant's assignments of error in this appeal is meritorious.

No error.

---

to support a finding that the matter in question is what its proponent claims." This provision is illustrated for the purposes of voice identification at Rule 901(b)(5): "Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." As mentioned above, however, defendant does not contest the tape's authenticity on appeal.