STATE OF NORTH CAROLINA v. RICKY DEAN ANDREWS

No. COA98-107

(Filed 17 November 1998)

**1. Witnesses— child—witness to her mother's murder—competent to testify**

The trial court did not abuse its discretion in a non-capital first-degree murder prosecution by allowing the daughter of the victim to testify where the child was four at the time of the inci-

STATE v. ANDREWS

[131 N.C. App. 370 (1998)]

dent and five at the time of trial; she stated during voir dire that she would tell the truth, then seemed confused and said it was not good to tell the truth; the prosecutor asked additional questions to determine whether she knew what it meant to tell the truth; she replied that it was not the truth to say her blue dress was red, that she knew she would get a spanking if she did something wrong, and that it was wrong to tell a lie; and she told the prosecutor that she knew she was in court to talk about defendant shooting her mother and that she wanted to tell the truth about the incident.

2. **Evidence— clergy privilege—waiver**

There was no plain error in a non-capital first-degree murder prosecution in allowing the testimony of a minister who served as chaplain for the sheriff's office to testify where the minister was called to the sheriff's office to talk to defendant because of the possibility of defendant being suicidal; the minister was aware of defendant's privilege and asked whether he could divulge information to officers; defendant agreed; defense counsel withdrew his objection at trial after defendant stated that he waived the privilege; the court questioned defendant to make sure that he understood that he possibly had a privilege; and defendant said that he understood and still wanted to waive the privilege. N.C.G.S. § 8-53.2

3. **Homicide— instructions—premeditation and deliberation—examples of circumstances supporting inference**

There was no plain error in a prosecution for non-capital first-degree murder in the trial court's examples in its instructions of circumstances from which premeditation and deliberation may be inferred.

4. **Criminal Law— instructions—lapsus linguae**

The trial court's use of "lack of provocation by the defendant" rather than "lack of provocation by the victim" in its instructions in a prosecution for non-capital first-degree murder was a mere lapsus linguae and the jury was not misled.

5. **Criminal Law— instructions—false, contradictory, and conflicting statements**

There was no plain error in a non-capital first-degree murder prosecution in the trial court's instructions on false, contradictory, and conflicting statements.

Appeal by defendant from judgment entered 26 June 1997 by Judge Julius A. Rousseau in Davidson County Superior Court. Heard in the Court of Appeals 21 October 1998.

On 12 October 1996 at about two o'clock in the morning, 21-year-old Kimberly Dawn Morris (Dawn) was shot through the head with a .357 caliber magnum revolver owned by her boyfriend, defendant Ricky Dean Andrews. The victim and her four-year-old child Kori were living with defendant.

The State offered evidence that the gun was between two and four feet away from Dawn when it was fired, and that the weapon in question functioned properly and would not fire unless the trigger was pulled. Defendant called 911 and stated that "his girlfriend had just shot herself." When asked whether any children were present, defendant told the 911 operator that "she was right here." Later in the same conversation, defendant told the 911 operator that he and his girlfriend had "struggled for the gun and it went off."

The first officer to arrive on the scene of the shooting found Dawn's body in a back bedroom with a "large caliber stainless steel revolver lying beside her right hand on the floor." Defendant gave several versions of the incident to police. In one version, defendant claimed Dawn had been falsely accused of being a drug addict and an alcoholic, and that she was going to confront the accuser with the gun. However, defendant and Dawn were struggling over the gun and it went off. There was evidence tending to show that prior to the incident, defendant's friends had told him about Dawn's job at a massage parlor and about her affair with another man. However, the State also presented evidence that Dawn had told several people prior to her death that defendant would kill her if he learned of the job or the affair. In another version, defendant entered the bedroom with the gun in his hand, "ran into something and the gun went off."

Dawn's mother testified that her daughter had lived with defendant for a year and a half. During the time Dawn and defendant lived together, Dawn's mother had picked up Dawn on a number of occasions when Dawn called her because defendant was "intoxicated or on drugs." Dawn's mother further testified that in the early morning hours of 12 October 1996, Dawn had called her twice. On the first occasion, Dawn asked her mother to come get her and the child. However, when the mother arrived, Dawn came outside and told her mother that she was going to stay because defendant had calmed down. At about five minutes before two o'clock, Dawn called her

mother again to come get her and the child. She was waiting outside defendant's home when the first officer arrived.

Dawn's mother also testified that after the shooting, Kori came to live with her. About two weeks after the incident, Kori began talking about her mother's death. Kori told her grandmother that her mother was sitting on the edge of the bed putting Kori's bedroom shoes on when defendant came in and shot "her mama." Kori also told her grandmother that Ricky placed the gun in Dawn's hand and told the child to tell the police that it was an accident. Kori testified at trial, similar to her grandmother's testimony, that defendant shot her mother while Kori was sitting on the bed in her bedroom and Dawn was sitting on the floor putting on Kori's bedroom shoes.

Defendant was tried for non-capital murder. A verdict of guilty was returned, and defendant was sentenced to life imprisonment without the possibility of parole.

*Attorney General Michael F. Easley, by Assistant Attorney General John G. Barnwell, for the State.*

*Paul Pooley for defendant appellant.*

HORTON, Judge.

Defendant contends the trial court erred in: (I) finding Kori competent to testify; (II) admitting the testimony of Reverend Knight; and (III) failing to properly instruct the jury.

I.

[1] Kori was born on 4 September 1992. She was four years old at the time of the incident and almost five years old at the time of trial. After a voir dire hearing, Kori was allowed to testify concerning her recollection of the incidents on 12 October 1996. Defendant did not object to her competency as a witness at trial.

Determining whether a child is competent to testify is a matter within the sound discretion of the trial court. *State v. Jenkins*, 83 N.C. App. 616, 621, 351 S.E.2d 299, 302 (1986), *cert. denied*, 319 N.C. 675, 356 S.E.2d 791 (1987). Furthermore, the trial court's decision will not be reversed on appeal unless it is shown that it could not have been the result of a reasoned decision. *State v. Spaugh*, 321 N.C. 550, 554, 364 S.E.2d 368, 371 (1988). When exercising its discretion, the trial court "must rely on [its] personal observation of the child's demeanor

and responses to inquiry on *voir dire* examination." *State v. Fearing*, 315 N.C. 167, 174, 337 S.E.2d 551, 555 (1985). "[T]he vast majority of cases in which a child witness' competency has been addressed have resulted in the finding, pursuant to an informal *voir dire* examination of the child before the trial judge, that the child was competent to testify." *Jenkins*, 83 N.C. App. at 621, 351 S.E.2d at 302-03.

N.C. Gen. Stat. § 8C-1, Rule 601(b) (1992) provides that "[a] person is disqualified to testify as a witness when the court determines that [she] is . . . (2) incapable of understanding the duty of a witness to tell the truth." In *State v. Jones*, 310 N.C. 716, 722, 314 S.E.2d 529, 533 (1984), the North Carolina Supreme Court cited as evidence of competency that the child knew that if she did not tell the truth she would get a spanking.

In the instant case, the trial court determined during a voir dire hearing that Kori was competent to testify. During voir dire, Kori stated she would tell the truth, but then seemed confused and said it was not good to tell the truth. Thereafter, the prosecutor asked additional questions to determine whether Kori knew what it meant to tell the truth. The prosecutor asked Kori if it was true to say her blue dress was red, and she responded that it was not the truth. Additionally, she said she knew she would get a spanking if she did something wrong and she knew it was wrong to tell a lie. Furthermore, Kori told the prosecutor that she knew she was in court to talk about defendant shooting her mother and she wanted to tell the truth about the incident. Thus, the trial court was correct when it concluded that Kori was competent to testify.

## II.

**[2]** In addition, defendant contends the trial court, on its own motion, should have refused to allow the testimony of Reverend Knight, minister of the First Pentecostal Holiness Church in Lexington and the chaplain for the sheriff's office. The sheriff's office paged Reverend Knight to come to the jail to counsel defendant. Defendant contends the admission of the testimony was plain error.

The plain error rule requires defendant to show that he would not have been convicted if the error had not been made or that a miscarriage of justice would result if the error is not corrected. *State v. Odom*, 307 N.C. 655, 660-61, 300 S.E.2d 375, 378 (1983). In the instant case, defendant has not met his burden.

Our Supreme Court has held that the wording of N.C. Gen. Stat. § 8-53.2 has two requirements for the clergyman privilege to apply, including: (1) defendant must be seeking the counsel and advice of his minister; and (2) the information must be entrusted to the minister as a confidential communication. *State v. West*, 317 N.C. 219, 223, 345 S.E.2d 186, 189 (1986). In *West*, the minister was a personal friend of defendant and initiated contact with defendant instead of defendant seeking the advice of the minister. Thus, the Supreme Court concluded the privilege did not apply.

However, the instant case is distinguishable from the *West* case because the sheriff's office called Reverend Knight to talk to defendant because of the possibility of defendant being suicidal. Based on the potential conflict of interest because Reverend Knight worked for the sheriff's office, the privilege would be applicable to protect defendant. Reverend Knight, as the chaplain for the sheriff's office, was aware of defendant's privilege and asked defendant whether the Reverend could divulge the information to the officers. Defendant talked to Reverend Knight and agreed afterwards to allow Reverend Knight to share the information with the officers.

At trial, defense counsel initially objected to Reverend Knight being able to testify based on privilege, but withdrew his objection after defendant stated he waived that privilege. The trial court questioned defendant to make sure he understood that he possibly had a privilege. The trial court specifically asked defendant whether he understood that the Reverend was paged by the sheriff's department to come talk to defendant, which could possibly keep it from being admissible. Defendant said he understood and still wanted to waive his privilege. N.C. Gen. Stat. § 8-53.2 (1986) provides that the statute "shall not apply where communicant in open court waives the privilege conferred." Therefore, the trial court did not err when it allowed Reverend Knight to testify.

### III.

Finally, defendant contends the trial court failed to properly instruct the jury: (A) on the circumstances from which it could infer premeditation and deliberation; and (B) on false, contradictory, and conflicting statements. Defendant failed to object to these instructions at trial. Thus, the plain error rule requires defendant to show that he would not have been convicted if the error had not been made or that a miscarriage of justice would result if the error is not corrected. *Odom*, 307 N.C. at 660-61, 300 S.E.2d at 378.

STATE v. ANDREWS

[131 N.C. App. 370 (1998)]

## (A)

**[3]** Defendant claims the trial court committed plain error in the jury instructions when it allowed examples of circumstances from which premeditation and deliberation may be inferred, which were not supported by the evidence. For example, defendant claims the facts of this case do not disclose a "vicious and brutal" killing, and there is no showing that defendant used excessive force. However, our Supreme Court has already stated that these examples are offered only for illustrative purposes. *State v. Leach*, 340 N.C. 236, 241, 456 S.E.2d 785, 789 (1995). Thus, these examples did not amount to plain error.

**[4]** Further, defendant claims the trial court committed plain error when it said "lack of provocation by the defendant" rather than "lack of provocation by the victim" in the jury instructions. However, "the trial court's charge to the jury must be construed contextually and isolated portions of it will not be held prejudicial error when the charge as a whole is correct." *State v. Boykin*, 310 N.C. 118, 125, 310 S.E.2d 315, 319 (1984). In fact, a "mere slip of the tongue by the trial judge in his charge to the jury which is not called to the court's attention at the time it is made will not constitute prejudicial error when it is apparent from the record that the jury was not misled thereby." *State v. Simpson*, 303 N.C. 439, 450, 279 S.E.2d 542, 549 (1981). A review of the record in the instant case shows that the trial court had a mere *lapsus linguae*, and the jury was not misled thereby. Thus, this assignment of error is overruled.

## (B)

**[5]** In addition, defendant argues the trial court committed plain error in its jury instructions regarding false, contradictory, and conflicting statements. The trial court gave the following instruction:

> Now, the State contends and, of course, the defendant denies that the defendant made false, contradictory and conflicting statements. If you find that the defendant made such statements, they may be considered by you with the circumstances tending to reflect the mental process the person possessed of a guilty conscience seeking to divert suspicion or to exculpate himself, and you shall consider this evidence along with all other believable evidence in this case.

> If, however, you find the defendant made such statements and they do not create a presumption of guilt and such evidence standing alone is not sufficient to establish guilt, such evidence

may not be considered as tending to show premeditation and deliberation.

As already noted, the jury instructions must be construed contextually. *Boykin*, 310 N.C. at 125, 310 S.E.2d at 319. A review of this instruction shows the trial court essentially conveyed the appropriate pattern jury instruction. The given instruction enabled the jury to determine that the statements do not create a presumption of guilt and that the contradictory statements alone are not sufficient to show guilt. Defendant has not met his burden of showing there would have been a different result in the outcome of this case by merely pointing out in the transcript that appropriate punctuation marks for the instructions are missing. Thus, this assignment of error is overruled.

For the foregoing reasons, the trial court's decision was free from prejudicial error.

No error.

Judges MARTIN, John C. and TIMMONS-GOODSON concur.