TYSON, Judge.
 

 *579
 
 Victor Jay Crisco, Jr. ("Defendant") appeals from his conviction of first-degree murder. We find no prejudicial error.
 

 *169
 

 I. Background
 

 Defendant was tried and convicted by a jury of murdering Carrie Welch ("Welch"). On 2 July 2010, a lineman employed with the power company was relocating power lines in Fayetteville when he discovered Welch's body. The body was found on Neptune Drive, a dirt road off of Bragg Boulevard, and behind the former Stereo World building. The lineman immediately called his supervisor, who called the police.
 

 Fayetteville Police Officer John Newland arrived on the scene where the body was discovered. Although Officer Newland was very familiar with Welch, it took him ten or fifteen minutes to identify the body, due to the presence of blood and disfigurement of the face.
 

 Dr. Jonathan Privette, a staff pathologist in the Medical Examiner's office, performed the autopsy on Welch's body. He was admitted and testified as an expert witness in forensic pathology, and opined that Welch died as a result of blunt force injuries to her head. He also testified that Welch was struck at least seven times on the head. Dr. Privette was unable to determine with certainty the type of instrument which caused the injuries, but testified they could have been caused by a baseball bat.
 

 The State's evidence tended to show Welch and her husband, Patrick Welch ("Patrick"), rented a residence owned by Defendant located on Rhew Street in Fayetteville. Patrick's mother paid Welch and Patrick's rent. Patrick's mother died approximately one month before Welch was murdered. Defendant lived about two blocks from the house he rented to Welch and Patrick.
 

 Marisha Garland ("Garland") supplied drugs to Welch, Patrick, and Defendant. Garland had known Welch for about ten years. On
 
 *580
 
 24 June 2010, Defendant called Garland's cellphone from the Cumberland County jail. Defendant was trying to reach Welch, who was present with Garland at the time. Garland handed the phone to Welch, who spoke with Defendant. According to Garland, Defendant wanted money retrieved from his house to use for his bail. Garland heard Welch say to Defendant that "she would have to get Patrick to do it because she couldn't go do it." According to Garland, Defendant agreed Patrick was to go into Defendant's house and get money to bail him out of jail.
 

 Patrick and an acquaintance went to Defendant's house. Shortly thereafter, Officer Rodney Miller responded to a complaint of someone loitering behind Defendant's house. When he arrived, he saw Patrick enter the back door of Defendant's house. Officer Miller called for backup and the officers entered the house. Patrick stated he had permission from Defendant to be in the house to get money for Defendant's bail. Defendant, who was still in jail, was contacted and told the police that no one was allowed to be in his house. Patrick and his acquaintance were arrested for breaking and entering. They were released the same day with unsecured bonds.
 

 Patrick failed to appear in court on the breaking and entering charge. A week later, on 1 July 2010, Defendant telephoned Officer Trevor Durham. Officer Durham testified that Defendant was out of jail and "irate" because Welch and Patrick broke into his house while he was in jail. Defendant wanted them immediately arrested and told Officer Durham where Patrick was located. The same evening, Officer Durham arrested Patrick for failing to appear in court on the breaking and entering charge.
 

 The same day, 1 July 2010, Welch called her sister-in-law, Wanda Wingard ("Wingard") around 10:00 p.m. from Defendant's cellphone. Welch asked Wingard for $300.00 to bail Patrick out of jail. Ms. Wingard asked her to call back the following morning so that she could verify the information given by Welch.
 

 A. Garland's Testimony
 

 According to Garland, Welch engaged in prostitution to raise the money needed to bail Patrick out of jail. Garland picked Welch up from a gas station after her last "date." They saw Defendant at the gas station. Garland drove Welch to Defendant's house around 3:00 a.m. Defendant arrived home approximately five minutes later. Garland went inside Defendant's house and stayed for
 
 *170
 
 approximately twenty minutes. She sold drugs to Welch and gave drugs to Defendant to "watch over" Welch because Welch was "scared."
 
 *581
 
 Garland testified Welch was supposed to call her around 8:00 a.m. for them to meet at 9:00 a.m. to go post Patrick's bail. At approximately 5:00 a.m., Garland received a call from Defendant's cellphone. Garland did not answer the call and a voicemail message was left. When Garland listened to the voicemail message, she heard loud "Elvis" music playing in the background and Welch screaming hysterically "wait, wait, wait." Garland testified Defendant often listened to "Elvis" music.
 

 Garland went to Defendant's house around 10:00 a.m. and spoke with Defendant, who was standing outside. She testified that Defendant appeared "normal" and was smoking a cigarette. Garland did not go inside the house, nor did she later describe the subject matter of that conversation with Defendant.
 

 Garland thereafter learned that Welch's body had been found behind the former Stereo World building. She returned to Defendant's house around 2:00 p.m. and entered Defendant's residence through the back door. She observed Defendant cleaning and wiping the kitchen floor. The house smelled of "a lot of Clorox, or bleach." She stated, "[t]he box said bleach."
 

 The day after Welch's murder, Defendant went to Wingard's house to collect Welch and Patrick's rent. Wingard told Defendant that the "money trail" stopped with the death of her mother-in-law. They would not be paying Welch and Patrick's rent. Defendant then asked Wingard if she had heard about Welch's death and stated there was a rumor going around the neighborhood that he had killed Welch.
 

 B. Matthew Black's Testimony
 

 Matthew Black ("Black") was an acquaintance of Defendant's since grade school. Black would occasionally perform handyman repair services for Defendant. One day in early 2011, Defendant called Black and stated he wanted Black to board up some windows in his house. Black picked Defendant up and the two men drove to Defendant's house. Upon arrival, they sat in Black's truck for a while. Black testified Defendant stated he had "an eerie feeling" about going inside the house. While they were inside the house, Defendant stated to Black that he was a "prime suspect" in the Carrie Welch murder case. Defendant also asked Black about applying polyurethane to the kitchen cabinets.
 

 Defendant and Black later purchased a bottle of tequila and went to Black's mother's house. They began drinking shots of the tequila. According to Black, Defendant told him that he had killed Welch with a baseball bat in his kitchen. Defendant explained to Black that Patrick
 
 *582
 
 Welch was in jail, and that Defendant had pending charges and would be going to jail. Defendant claimed Welch was blackmailing him. Defendant stated Welch told him "if he didn't take care of her ... he was going to become [Patrick's] bitch."
 

 Defendant went to the bathroom. Black called his wife, Michelle, and told her to stay on the phone and just listen. Defendant returned and Black and Defendant continued to discuss Welch's murder. Defendant told Black again that he had killed Welch. He stated he burned the baseball bat in the fire pit outside his house and took the body to a remote area off Bragg Boulevard near the former Stereo World building. Defendant spent that night at Black's mother's house. The next morning Defendant told Black to forget what he had told him the previous night.
 

 Michelle Black testified her husband called her and told her to listen, but not talk. She heard her husband ask a man, whose voice she recognized as Defendant's, to repeat what he had just said. Defendant stated he and Welch were in the kitchen, he beat her with a baseball bat, and took her body to Bragg Boulevard.
 

 In February 2011, Matthew Black placed two calls to Crime Stoppers to report what Defendant had told him. Crime Stoppers offers rewards for tips that lead to criminal convictions. Michelle Black testified her husband called Crime Stoppers the day after Defendant confessed to the murder.
 

 *171
 
 Detective Jason Sondergaard received the tips from Crime Stoppers on 14 February 2011. He contacted Black on 28 February 2011 and set up an interview. Detective Sondergaard interviewed Black and his wife on 1 March 2011.
 

 Sometime later, Defendant contacted Black and asked him if he had contacted the police. Black lied and told Defendant he had not. Defendant stated to Black that he had told a preacher from Sanford about the murder. Defendant told Black he regretted telling the preacher, because the preacher was now acting differently. Defendant also told Black he did not believe the preacher would keep the information to himself.
 

 C. Search of Defendant's Residence
 

 On 1 March 2011, Fayetteville police officers and SBI agents executed a search warrant on Defendant's residence. Officer Dianne Bettis, a K-9 handler certified in cadaver recovery, searched the house with a cadaver dog. The dog alerted on a set of drawers located in the kitchen.
 

 *583
 
 Chadrick Barefoot ("Agent Barefoot"), an SBI crime scene agent, searched the house for evidence of blood. He observed dark red stains in a linear pattern on the kitchen ceiling. Agent Barefoot also discovered blood stains on the wooden floor in a room adjacent to the kitchen and underneath the floorboards. He applied Luminol to areas throughout the home and observed a pale blue glow, indicating a positive result for the presence of blood. These areas included the kitchen floor; an area near the bathroom and bedroom; on the couch in the living room; and in the area between the living room and kitchen.
 

 Jessica Posto, a former SBI expert witness in body fluid identification, examined items located in Defendant's house for the presence of blood. The swabbings from the kitchen ceiling and a deadbolt lock in the kitchen returned a positive chemical reaction to indicate the presence of blood.
 

 Sharon Hinton ("Hinton"), a forensic analyst at the North Carolina State Crime Laboratory, tested the blood samples collected from Defendant's house to determine whether the DNA profile contained in the samples matched Welch's DNA profile. Hinton testified three blood samples obtained from the house completely matched Welch's DNA profile. Those three samples were obtained from the kitchen ceiling, the kitchen wall near a door, and underneath a wooden floor board in an additional room in the house.
 

 Charles Lee Newcomb ("Newcomb"), an SBI fire and arson investigator, examined three pieces of burned wood recovered from Defendant's backyard fire pit. Newcomb testified that the pieces of wood had a "very tight grain pattern" and a slight curvature. He testified that each piece of charred wood could have been portions of a baseball bat.
 

 Defendant was indicted for Welch's murder on 19 March 2012. On 11 August 2014, Defendant filed a motion to suppress from the jury any confession Defendant made to Ronnie Roy ("Pastor Roy"), pastor at Messiah Baptist Ministries, pursuant to N.C. Gen.Stat. § 8-53.2. Defendant also filed a motion
 
 in limine
 
 to exclude Matthew Black's testimony that Defendant told him he had confessed to a preacher. This motion requested the court to order the State to "refrain from directly or indirectly eluding to a confession made by the defendant to his pastor" pursuant to N.C. Gen.Stat. § 8-53.2 and Rules 402 and 403 of the Rules of Evidence. This motion asserted Black had been interviewed several times by the State and defense counsel, and had only mentioned Defendant's confession to a pastor within the ten days preceding the filing of the motion.
 

 *584
 
 The court heard the motions immediately prior to the commencement of trial. The court heard
 
 voir dire
 
 testimony from Black and Pastor Roy. Black testified to the statements Defendant made to him at his mother's house about Welch's murder. Black also testified about Defendant's phone call to him in which he asked Black if he had talked to the police and stated he had told a preacher in Sanford about the murder.
 

 Pastor Roy testified at the motion hearing that he was ordained by Bethel Bible College in Sanford. He had previously served as the pastor of Messiah Baptist Church in Harnett County. Pastor Roy met Defendant, while both were students at Fayetteville Technical
 
 *172
 
 Community College, and they became acquaintances. The two men later lost touch and Pastor Roy became ordained as a pastor.
 

 Pastor Roy stated he had not spoken with Defendant for a "long time." He re-connected with Defendant after he saw Defendant's name in a "crime magazine" pertaining to an unrelated charge. Pastor Roy contacted Defendant and informed him that he had become a pastor, saw that Defendant was in trouble, and offered to help Defendant. Pastor Roy thereafter contacted Defendant once or twice per week and they talked. Defendant accepted Pastor Roy's offer to participate in counseling sessions with him. Defendant stated he wanted to stop using drugs and to change his life.
 

 During one of the counseling sessions, Defendant and Pastor Roy discussed truthfulness as part of Pastor Roy's program: "12 Steps to Freedom in Christ." Defendant told Pastor Roy he murdered Welch by beating her to death with a baseball bat, disposed of her body, and attempted to clean up the murder scene. Defendant also told Pastor Roy that Welch was trying to raise money to get her husband out of jail, but Defendant was afraid of her husband and did not want him to be out of jail. Defendant also told Pastor Roy that Welch came to his house one night and believed Defendant was going to give her money. While Welch was on the phone, Defendant picked up a baseball bat and beat her to death.
 

 Pastor Roy stated Defendant participated in several more counseling sessions with him over the next few weeks. On these occasions, Defendant would ask him whether their conversation was being recorded or if he had called the police. Pastor Roy stated he became fearful of Defendant and called the police. Pastor Roy testified at the motion hearing only, out of the presence of the jury.
 

 *585
 
 The trial court ruled the clergy-communicant privilege did not exist because Pastor Roy had initially sought Defendant and offered to help him. The trial court determined Defendant was not seeking counsel and advice from his minister. If the privilege did exist, the court determined it was waived when Defendant confessed to Black and told Black he had told a preacher about the murder. Pastor Roy was present at trial, but was not called to testify.
 

 The jury found Defendant guilty of first-degree murder. The trial court sentenced him to life in prison without the possibility of parole. Defendant appeals.
 

 II. Issue
 

 Defendant argues the trial court erred in concluding the clergy-communicant privilege did not apply and by denying Defendant's motion to suppress and motion
 
 in limine
 
 concerning his statements.
 

 III. Clergy-Communicant Privilege
 

 A. Standard of Review
 

 This Court's review of the trial court's order denying a motion to suppress "is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law."
 
 State v. Stanley,
 

 175 N.C.App. 171
 
 , 174,
 
 622 S.E.2d 680
 
 , 682 (2005) (citations omitted). The trial court's conclusions of law are reviewed
 
 de novo.
 

 State v. Campbell,
 

 188 N.C.App. 701
 
 , 704,
 
 656 S.E.2d 721
 
 , 724 (2008) (citation omitted).
 

 B. Application of Privilege
 

 N.C. Gen.Stat. § 8-53.2, entitled "Communications between clergymen and communicants," provides:
 

 No priest, rabbi, accredited Christian Science practitioner, or a clergyman or ordained minister of an established church shall be competent to testify in any action, suit or proceeding concerning any information which was communicated to him and entrusted to him in his professional capacity, and necessary to enable him to discharge the functions of his office according to the usual course of his practice or discipline, wherein such person so communicating such information about himself or another is seeking spiritual counsel and advice relative to and growing
 
 *586
 
 out of the information so imparted, provided, however, that this section shall not apply where
 
 *173
 
 communicant in open court waives the privilege conferred.
 

 N.C. Gen.Stat. § 8-53.2 (2013).
 

 Our Supreme Court has held that § 8-53.2 has two requirements for the clergy-communicant privilege to apply: (1) the defendant must be seeking the counsel and advice of his minister; and (2) the information must be entrusted to the minister as a confidential communication.
 
 State v. West,
 

 317 N.C. 219
 
 , 223,
 
 345 S.E.2d 186
 
 , 189 (1986). This statute expressly allows the communicant to waive the privilege in open court. N.C. Gen.Stat. § 8-53.2.
 

 The State did not call Pastor Roy to testify before the jury. However, the trial court's denial of Defendant's motion to suppress and motion
 
 in limine
 
 allowed evidence that Defendant had communicated with Pastor Roy to be admitted into evidence through the testimony of other witnesses. Black testified as follows:
 

 Q: During any conversation he-Mr. Crisco said what to you about-you started to say a preacher?
 

 A: Yeah, he said that he had met a preacher in Sanford and that he had told the preacher about it and he was uncomfortable that he had told the preacher about it, and that-that the preacher wasn't acting right about him telling him, you know, like he would keep it to himself or something. I don't-
 

 Q: Now, you said "it" a lot, like what you're talking about; he told the preacher about what?
 

 A: The murder.
 

 The trial court
 
 ex mero moto
 
 also asked Black about Defendant's conversation with Pastor Roy in front of the jury:
 

 THE COURT: Can you tell me exactly what Mr. Crisco said about any conversation with a preacher?
 

 THE WITNESS: Yes, sir. He told me that he-the preacher was helping him in Sanford get on his feet, and then he told me that he had told the preacher about this murder, and that he wished he wouldn't had [sic] told him that, that the preacher kind of-in other words, wasn't going to-he didn't think he was going to keep it to himself, something of that nature, that he was telling.
 

 *587
 
 The State brought up the subject of the preacher again during its direct examination of the lead detective, Detective Sondergaard, its last witness:
 

 Q: Were you present in the courtroom when Matthew Black during his testimony mentioned a phone call that he received from Mr. Crisco and discussed talking to a preacher, that Mr. Crisco spoke to a preacher; do you recall that testimony?
 

 A: Yes.
 

 Q: Right now just answer with a yes or no: Throughout the course of your investigation, were you contacted by a preacher?
 

 A: Yes.
 

 Q: What was-
 

 [DEFENSE COUNSEL]: Objection.
 

 THE COURT: Overruled as to that.
 

 BY [THE PROSECUTOR]:
 

 Q: What was his name?
 

 A: Ronnie Roy.
 

 Q: Is he present in the courtroom?
 

 A: Yes, he is.
 

 By its plain and ordinary meaning, N.C. Gen.Stat. § 8-53.2, applies to the competency of clergyperson's testimony, and only applies to communications between Defendant and Pastor Roy. Although Pastor Roy was not called and did not testify before the jury at trial, Defendant argues the State circumvented Defendant's privileged communication to Pastor Roy by eliciting testimony from Black and Detective Sondergaard about the privileged communication. Even without calling the preacher to testify, Defendant argues the State was able to show the jury Defendant had confessed to a preacher, and the preacher was real and present before them, all in violation of the privilege.
 

 A party who communicates and makes disclosures to his preacher does not have "any reason to expect confidentiality" when the disclosures are made in the presence of a third party.
 
 West,
 

 317 N.C. at 223
 
 ,
 
 345 S.E.2d at 189
 
 (holding the defendant's admissions to his preacher
 
 *588
 
 were not " entrusted" to the preacher in pursuit of counsel and
 
 *174
 
 advice when the preacher's wife was present). In the context of the clergy-communicant privilege, our appellate courts have not considered whether a disclosure made to clergy can be waived by an out of court, voluntary disclosure of the substance of the communication to a third party.
 

 However, "[i]t is well established in this state that even absolutely privileged matter may be inquired into where the privilege has been waived by disclosure."
 
 Industrotech Constructors, Inc. v. Duke University,
 

 67 N.C.App. 741
 
 , 743-44,
 
 314 S.E.2d 272
 
 , 274 (1984) (holding any privilege of confidentiality in arbitration transcripts had been waived by the university's disclosure of the materials to a non-party). The plain language of the statute itself allows waiver in open court.
 

 N.C. Gen.Stat. § 8-53.2 applies only to "confidential" communication between clergy and communicant. The statute does not restrict the applicability of the privilege based upon which party initiates the communication. Presuming Defendant was seeking the counsel and advice of Pastor Roy when he confessed to Welch's murder, Defendant's statements were "entrusted" to Pastor Roy under the privilege. N.C. Gen.Stat. § 8-53.2.
 

 Defendant told Black, a third party and not a pastor, that he had confessed to "a preacher in Sanford" about the murder.
 
 West,
 

 317 N.C. at 223
 
 ,
 
 345 S.E.2d at 189
 
 . No recognized privilege exists between Defendant and Black. The statement by Defendant to Black that Defendant had confessed to a preacher is not privileged. The State was permitted to present evidence of statements Defendant made to Black because N.C. Gen.Stat. 8-53.2, by its express terms, does not apply to or exclude those statements.
 

 D. Prejudice
 

 Even if we accept Defendant's argument that the trial court erred in admitting Black's testimony that Defendant stated he had told "a preacher from Sanford" about the murder or Detective Sondergaard's testimony, Defendant has failed to show prejudice to warrant a new trial. Erroneous admission of evidence requires a new trial only when the error is prejudicial.
 
 State v. Locklear,
 

 349 N.C. 118
 
 , 149,
 
 505 S.E.2d 277
 
 , 295 (1998),
 
 cert. denied,
 

 526 U.S. 1075
 
 ,
 
 119 S.Ct. 1475
 
 ,
 
 143 L.Ed.2d 559
 
 (1999). "A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen.Stat. § 15A-1443(a) (2013). The burden rests upon Defendant to show prejudice.
 

 Id.
 

 *589
 
 The State presented other relevant and substantial evidence from which a jury could find beyond a reasonable doubt that Defendant killed Carrie Welch and committed first-degree murder: (1) Garland left Welch with Defendant at his home in the early morning hours of 1 July 2010; (2) around 5:00 a.m., Welch called Garland from Defendant's cellphone; (3) in the voicemail message left on Garland's phone, "Elvis" music was playing and Welch was hysterically screaming "wait, wait, wait"; Defendant regularly played " Elvis" music; (4) around 2:00 p.m. the same day, Garland returned to Defendant's home and saw Defendant wiping his kitchen floor; (5) the residence smelled of bleach and Garland saw a box of bleach; (6) Defendant told Black he killed Welch in his kitchen with a baseball bat; (7) Michelle Black heard Defendant state he beat Welch to death with a baseball bat and took her body to Bragg Boulevard; (8) blood was found on Defendant's kitchen ceiling, the kitchen wall, and the floor in an additional room, which matched Welch's DNA profile; (9) charred pieces of wood with a "very tight grain pattern" and slight curvature were found in Defendant's backyard; (10) an SBI fire and arson expert testified each piece of charred wood could have been portions of a baseball bat.
 

 Defendant has failed to show a reasonable possibility exists that a different result would have been reached by the jury if Black or Detective Sondergaard had not been permitted to testify Defendant stated to him that he told "a preacher in Sanford" about the murder.
 

 *175
 
 The admission of Black's testimony was not prejudicial error to warrant a new trial.
 

 IV. Conclusion
 

 The clergy-communicant privilege set forth in N.C. Gen.Stat. § 8-53.2 does not depend upon which party initiates the communication. The privilege does not apply to Defendant's statements to Black, a third party and non-pastor, about his confession to "a preacher in Sanford" regarding the murder. No privilege exists between Defendant and Black to exclude Black's testimony.
 

 Even if the admission of Black's or Detective Sondergaard's testimony was error, Defendant has failed to show prejudice. Defendant received a fair trial, free from prejudicial errors he preserved and argued.
 

 NO PREJUDICIAL ERROR.
 

 Judges BRYANT and GEER concur.