STATE OF NORTH CAROLINA v. EUGENE RICKY PULLEY

No. COA05-892

(Filed 7 November 2006)

## 1. Identification of Defendants— encounter on highway— photograph shown by neighbor—findings

The trial court did not err by admitting in-court and out-of-court identifications of defendant where findings to which no error was assigned detailed circumstances in which defendant was seen along a highway near where his wife's body was eventually found, and findings to which error was assigned but which were supported by competent evidence detailed the identifica-

tion of defendant by one of the men who had seen him on the highway, including an identification from a photograph shown to the witness by a neighbor.

**2. Identification of Defendants— pretrial identification— photograph shown by neighbor—not unduly suggestive**

The trial court did not err by concluding that a pretrial identification of defendant from a photograph shown by a neighbor did not result in the likelihood of misidentification and that the in-court identification was of independent origin. The display of the photograph was not done in an impermissibly suggestive manner, but was an attempt to eliminate defendant as a suspect. Even assuming an impermissibly suggestive identification, the court's findings about the encounter between the witness and the defendant support an independent in-court identification.

**3. Evidence— other offenses—misuse of credit card—relevance—financial circumstances and chain of events**

Evidence in a first-degree murder prosecution that defendant misused a church credit card before and after his wife's disappearance was relevant as part of the chain of events as well as to show their financial status. Additionally, defendant's improper use of the credit card was linked in time and circumstance with the crime, and was not offered to show a propensity to commit murder.

**4. Evidence— communications at church meeting—not for counseling—presence of non-minister**

Communications at a church meeting were not protected by clergy-communicant privilege because the purpose of the meeting was to address administrative issues rather than the seeking of counsel and advice. Furthermore, the conversation between defendant and clergy was in the presence of an elder, who was not an ordained minister.

**5. Criminal Law— religious references during trial—not prejudicial**

There was no error from the use of religious references during a trial where the specific incidents were not objected to, resulted in a sustained objection, or occurred during a closing argument which was colored with biblical references but which did not rise to the level of gross impropriety necessary for ex mero motu intervention.

**6. Indictment and Information— county in which crime occurred—venue rather than jurisdiction**

Jurisdiction to hear a case is statewide; the proper county in which to bring the case is an issue of venue. There was no plain error in the instructions where an indictment alleged that an offense was committed in Caswell County and the court instructed the jury that the State must prove that the alleged homicide was committed in North Carolina.

**7. Constitutional Law— ineffective assistance of counsel— record not sufficient**

The record was not sufficient to determine defendant's claims of ineffective assistance of counsel. His assignments of error were dismissed without prejudice to his right to assert them in a motion for appropriate relief.

Appeal by defendant from judgment entered 29 October 2004 by Judge W. Osmond Smith, III in Caswell County Superior Court. Heard in the Court of Appeals 28 March 2006.

*Roy Cooper, Attorney General, by Jill Ledford Cheek, Special Deputy Attorney General, for the State.*

*Stubbs, Cole, Breedlove, Prentis & Biggs, P.L.L.C., by C. Scott Holmes, for defendant-appellant.*

MARTIN, Chief Judge.

Defendant Eugene Ricky Pulley appeals from a judgment, sentencing him to life imprisonment without possibility of parole, entered upon his conviction by a jury for the first degree murder of his wife, Patty Jo Pulley. We find no error.

The State offered evidence at defendant's trial tending to show the following: In May of 1999, defendant and Patty Jo Pulley were married and living in Ringgold, Virginia. Defendant was employed as a youth pastor and music director with the River of Life Church in Ringgold. His wife cleaned homes and gave piano lessons.

On the morning of 14 May 1999, defendant drove his wife to a home she was to clean. He returned to pick her up sometime later that afternoon. A neighbor, Bethany Sudduth, called to ask for a ride to a school play and spoke with defendant, who told her Patty Jo was not feeling well. Later the same afternoon, defendant called and

asked Bethany's mother, Judy Sudduth, if she had seen Patty Jo. Still later, defendant called and told Judy Sudduth that his dog had gotten loose and had chased a squirrel; he asked her to keep an eye out for the dog. Soon after, Judy Sudduth heard defendant calling the dog and went outside, where she saw defendant climbing an embankment. He had a red wound on the left side of his face.

In the late hours of 14 May 1999, defendant began informing people that Patty Jo had disappeared. He went with Rev. Sudduth, the pastor of the River of Life Church, to search for her. The following morning, several members of defendant's church joined the search and, at approximately 2:00 p.m., Richard Gardner found the Pulleys' red truck on River Bend Road, a short distance off of Highway 62.

Defendant's scratches drew suspicion. He told Pittsylvania County, Virginia, investigator William Bagley that he had scratched his face while searching for his wife. However, he told another witness that he had scratched his face while looking for his dog, and a third witness that his dog had scratched his face while playing. A pathologist testified that the scratch marks on his face, as shown in photographs, appeared more like fingernail marks than briar marks, though he did have scratches on his arms which were consistent with briars. Defendant also had bruising on his right upper arm that was consistent with a "grab mark." There was evidence that Patty Jo had gotten some false fingernails prior to 14 May 1999.

The State also offered evidence tending to show that between 8:30 p.m. and 9:00 p.m. on the evening of 14 May 1999, Robert Rowland and Dale Purvis were traveling together on Virginia Highway 62, also known as the Milton highway, on their way to Purvis's home on River Bend Road. It was raining and was dark enough to drive with the headlights on, though it was not entirely dark. The two men observed a man walking along the road not far from the River of Life Church. The man reminded Purvis and Rowland of a friend of theirs. Rowland observed the man for ten to fifteen seconds. Purvis and Rowland thought about offering assistance but decided that Rowland would offer help once Rowland picked up his car at Purvis's house and made his way back up the road. When the men turned on to River Bend Road, they saw a pickup truck sitting beside the road. The truck had not been there when the men left Purvis's house earlier that same evening. Both Purvis's house and the place where the truck was parked were in North Carolina.

**STATE v. PULLEY**

[180 N.C. App. 54 (2006)]

On approaching the man for a second time, Rowland pulled up beside him, brought his vehicle to a complete stop and offered the man a ride. The man refused the offer while turning his head away from Rowland. Rowland asked if the man's car was broken down and continued to offer assistance. The man persisted in his refusal of any help. During this exchange, Rowland and the man were somewhere between ten and twelve feet apart. Rowland described the man as heavy set and white, taller than himself, with light black, possibly brown, colored. hair. After a little more than one minute, Rowland continued down the road. Over defendant's objection, Rowland identified defendant as the man he had seen on the side of Highway 62 on the night in question.

William Steven Keel, a self-employed resident of Ringgold, was a neighbor of the Pulleys and also an acquaintance of Rowland. Keel testified that sometime shortly after Patty Jo Pulley's disappearance, he learned of the encounter between Rowland and the man on the Milton highway on the night of Patty Jo's disappearance. Keel went to Rowland's house and showed him a photograph of defendant, which had been taken from a church directory, and asked if the man pictured was the same man Rowland encountered on the highway on 14 May 1999. Rowland indicated that he was "85 percent certain that it was him."

There was evidence that prior to Patty Jo's disappearance, Rev. Sudduth had become concerned about defendant suffering from "burnout" and had offered him a sabbatical and a reduction in his involvement in the affairs of the church. Defendant reacted angrily and declined the opportunity. After Patty Jo's disappearance, during the summer of 1999 following defendant's return from a church-related trip to Texas, Rev. Sudduth and other ministers of nearby churches, as well as one of the elders of the River of Life Church, called a meeting with defendant to discuss some improper credit card charges which defendant had made on the church credit card. At that meeting, defendant disclosed that his relationship with Patty Jo had become strained because he had suffered from erectile dysfunction. In September 1999, defendant resigned from the church and moved to Lebanon, Virginia. On 18 December 2002, skeletal remains identified as those of Patty Jo Pulley were found in Caswell County, North Carolina, near a bridge over Hyco Creek near the place where the Pulley's truck had been discovered roughly nineteen months earlier. A nylon cord was knotted and looped around the top of the rib cage near the neck area. In the opinion of the medical examiner,

Patty Jo Pulley died as a result of violent injury or trauma, most likely asphyxiation.

The State also offered evidence through the testimony of Samuel Scott Harold, who was an inmate at the Caswell County jail while defendant was incarcerated there awaiting trial. Harold testified that defendant told him that Patty Jo Pulley had found out that defendant was having an extramarital affair, had followed him and had confronted him. Defendant confessed to Harold that he had strangled Patty Jo and had driven around for a period of time trying to dispose of her body. He placed the body under a low-lying bridge.

At the close of the State's evidence, defendant moved for dismissal of the charges for insufficiency of the evidence and for lack of jurisdiction. The motion was denied.

Defendant offered evidence which tended to show that he and Patty Jo had married in 1982 and moved to Ringgold and joined the River of Life Church staff full time in 1994. They were both involved in the music ministry of the church, and though Patty Jo was not paid, she contributed her efforts to that ministry and to youth and outreach activities. They were a very happy and loving couple and participated in a number of mission trips together. Because of defendant's meager salary, the couple struggled financially, which caused strains upon their marriage, as did other factors. Defendant had spent money making phone-sex calls at one point, and in 1994, he had become involved in a romantic, though not sexual, relationship with another woman with whom Patty Jo was acquainted. He confessed the affair to Patty Jo and she forgave him, though he acknowledged that for a time there were issues of trust. In addition, defendant had occasional sexual dysfunction which strained their relationship.

Defendant also had relationship problems with Rev. Sudduth, which came to a head in March 1999 when Rev. Sudduth asked defendant to reduce his workload at the church. Defendant wanted to go on a mission trip to Romania, but Rev. Sudduth would not permit him to go at church expense. Though defendant was angered at the denial of his request, he and Patty Jo went at their own expense.

In early May of 1999, while Patty Jo was on a trip to Maggie Valley with other church members, defendant experienced a feeling during prayer that an attack was about to be made upon Patty Jo or their marriage. The same evening, he received a telephone call from an

anonymous caller that Patty Jo was having an affair. When she returned, he told her about these events, but made no accusations.

On 14 May, defendant took Patty Jo to her job cleaning a house, and then he spent the morning working with Richard Gardner, the church administrator, in preparation for an upcoming conference, putting beds together and moving mattresses. He also did some errands. In mid-afternoon, he received a call from Patty Jo. She told him she was getting a bad cold and asked him to come and pick her up from her job. He picked her up between 4:30 p.m. and 5:00 p.m. and they went to their home. After bathing, Patty Jo told defendant she was going into town shopping to get some items for the church conference. She left home driving the couple's pickup truck. Richard Garner testified that he saw both vehicles at the house about 6:00 p.m., but a few minutes later, both were gone.

Defendant testified that he had planned to go to a local high school play. Before leaving, he took his dog outside and the dog ran after some rabbits and got away from him. He called Judy Sudduth and asked her to look out for the dog, and then he went out to look for the dog. While doing so, he tripped and fell into some briars, scratching his face. When he found the dog, he took her home and cleaned up. He left to go to the play after 7:00 p.m., driving their van.

Because he was tired, defendant left the play before it was over. As he left, he spoke with Jamie Shackleford, whose child had been in the play. He got to his home between 10:15 p.m. and 10:30 p.m. Neither Patty Jo nor their truck was at home. He took the dog on a walk and watched television for a little while. When Patty Jo did not return, defendant became worried and made some telephone calls to places where he thought she might have gone. He also called Judy Sudduth. He then drove into Danville to look for her, and being unable to locate her or the truck, called 911 to report her missing. He then went to find Rev. Sudduth and the two men searched for Patty Jo during the night.

The next day, other members of the church joined in the search, and the truck was located on River Bend Road. Defendant went to the location and, upon arrival, ran toward the truck calling his wife's name. In the days following Patty Jo's disappearance, defendant appeared to others to be distraught, emotional, and in shock.

Defendant also offered the testimony of two witnesses, one a forestry expert and the other a criminologist, that the scratches

on his face were consistent with briar scratches and did not appear to be the result of fingernail scratches. Defendant testified that the bruises on his arms were caused by his lifting the mattresses earlier on 14 May. Defendant denied telling Scott Harold that he had killed Patty Jo.

I.

[1] Defendant contends the trial court erred by denying his motion to suppress evidence of Rowland's pretrial identification of defendant and his in-court identification of the defendant. "On a motion to suppress evidence, the trial court's findings of fact are conclusive on appeal if supported by competent evidence." *State v. Campbell*, 359 N.C. 644, 661, 617 S.E.2d 1, 12 (2005), *cert. denied*, —— U.S. ——, 164 L. Ed. 2d 523, 126 S. Ct. 1773 (2006). Findings of fact not specifically assigned as error are "deemed supported by competent evidence and are binding on appeal." *State v. Sutton*, 167 N.C. App. 242, 245, 605 S.E.2d 483, 485 (2004). If the trial court's conclusions of law are supported by the findings of fact, they are conclusive on this Court. *State v. Tuttle*, 33 N.C. App. 465, 468, 235 S.E.2d 412, 414 (1977).

After a *voir dire* hearing, the trial court entered an order containing findings of fact and denying defendant's motion to suppress. The fifth finding of fact, related to Rowland's observations on 14 May 1999, has not been assigned as error by the defendant, thus the facts contained therein are deemed supported by competent evidence and are binding on review. *See Sutton*, 167 N.C. App. at 245, 605 S.E.2d at 485. The finding, in sum, established that on 14 May 1999, Purvis and Rowland initially saw a man on the side of Highway 62 approximately one tenth of a mile from the River Bend Road intersection. Rowland observed the man for ten to fifteen seconds, including the time approaching and passing him in Purvis's car. Purvis and Rowland remarked that the man looked like a friend of theirs nicknamed "Too Slow." Continuing down the highway, Purvis and Rowland saw a pickup truck on the shoulder of River Bend Road. Thinking the man must have broken down, Rowland told Purvis he would stop and pick the man up while traveling back up Highway 62. On his return trip, Rowland brought his vehicle to a complete stop, opened the door and asked the man if he needed a ride. Rowland continued to offer assistance for a little over a minute. Rowland and the man were approximately ten to twelve feet apart. The man was a white male wearing a white shirt. Rowland described the man as "heavy set, being taller than Rowland, with light black, maybe brown, hair, kind

of long in the back, kind of flat across the top." It was misting rain and the man was wet.

Defendant has assigned error to other of the trial court's findings, however. We have considered them *in seriatim* and conclude that each is supported by competent evidence.

The findings in dispute include the trial court's sixth finding of fact that, based on Rowland's observations from 14 May 1999, Rowland was certain he spoke with the defendant on the night in question. Rowland testified with certainty on *voir dire* that the person he encountered and spoke to was defendant, stating, "[w]ell, I'm sure that's who I was talking to." Defendant also assigned error to the seventh finding of fact, that Keel showed defendant's picture to Rowland without first revealing the identity of the photo's subject. When asked if Keel initially informed him that the picture was of defendant, Rowland answered that Keel did not tell him the name of the person in the picture; he stated that Keel "showed me a picture and asked me, is this the fella, and I said yes."

Defendant also challenged the ninth and eleventh findings of fact. Portions of these particular findings, that Rowland's in-court identification was based on observations from 14 May 1999 and was independent and uninfluenced by the photograph displayed by Keel, are actually conclusions of law and will be reviewed as such. *See Johnson v. Adolf*, 149 N.C. App. 876, 878 n.1, 561 S.E.2d 588, 589 n.1 (2002). Within the remaining portions of the ninth finding of fact, the trial court found that Rowland did not know the defendant before their encounter on 14 May 1999, Rowland was positive the defendant was the man he saw on that date, there was no prior misidentification by Rowland of the defendant and that "[t]he descriptions provided by Rowland and Purvis to investigators are generally consistent with later observations made by Rowland in his testimony and consistent with other circumstances in the case." Rowland testified that he did not know the defendant during the time period surrounding May of 1999. Further, Rowland referred to statements he made to investigators and supported the continuity between those statements and Rowland's in-court testimony.

Defendant next assigned error to the trial court's tenth finding of fact:

The showing to Rowland by Keel of a photograph was not, in any respect whatsoever, a law enforcement procedure and was com-

pletely independent of any law enforcement investigation and was done completely by Keel of his own volition. The primary thoughts and intention of Keel in showing a photograph to Rowland was an attempt to eliminate the defendant as a suspect as opposed to suggest the defendant as a suspect.

Keel was asked to describe his involvement with law enforcement during the past thirty years. His involvement was limited to volunteering in jails and prisons, including work as an unpaid chaplain. Keel testified that he spoke with a detective shortly after defendant's wife was reported missing, but in no other way indicated that his action in becoming involved in the investigation was connected with, or encouraged by, local law enforcement officials. Keel testified with respect to his motives:

> Well, I was quite alarmed that Rick was suspected in this event, and my son-in-law had told me that [Purvis and Rowland] had spotted someone on the road and talked to them, and they also had told me that it didn't seem as if the police department was investigating that event, and keep in mind these people live, you know, within an easy walking distance of my house. These are my dear neighbors that I've had this current relationship with. So, it occurred to me I could clear this up. I could get Rick out of the picture in a minute. All I have to do is take a picture of Rick over there and show it to them, and he'd say it wasn't him, and it would be the end of the matter and take a real load off the church and off Rick and everybody else.

Defendant also assigned error to the twelfth finding of fact, that Rowland had sufficient opportunity to observe the man on 14 May 1999. The evidence showed, however, that Rowland observed the man twice, once for a period of ten to fifteen seconds and the second time for over one minute from a distance of ten to twelve feet. Rowland testified to a level of attention and detail as to adequately support the court's finding that Rowland had sufficient opportunity to observe the man on 14 May 1999.

Finally, defendant challenged the thirteenth finding of fact, that any confusion read into Rowland's testimony as to the term "identification" arose when Rowland thought "he was being asked about putting a name with the face as opposed to comparing face-to-face or otherwise linking a person to the person that he saw on May 14, 1999." Rowland testified that he did not know the defendant at the time of the incident. Keel named the man in the photo immediately

after Rowland indicated that the photo depicted the man he saw. The trial court's finding, that Rowland believed he was being asked what enabled him to put a name with the defendant's face, is supported by competent evidence. Each of the trial court's findings of fact to which defendant assigned error are supported by the evidence and are, therefore, binding on this Court.

[2] We must next determine whether those findings of fact support the court's conclusions of law. *State v. Campbell*, 359 N.C. 644, 662, 617 S.E.2d 1, 13 (2005), *cert. denied*, —— U.S. ——, 164 L. Ed. 2d 523, 126 S. Ct. 1773 (2006). On the motion to suppress, the question before the trial court concerned the nature of the pretrial identification and its impact, if any, on the in-court identification. A two-step process is used to determine whether pretrial identifications deny a defendant due process. *State v. Hannah*, 312 N.C. 286, 290, 322 S.E.2d 148, 151 (1984). First, it must be determined "whether an impermissibly suggestive procedure was used in obtaining the out-of-court identification." *Id.* The test under this inquiry is "whether the totality of the circumstances reveals a pretrial procedure so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice." *Id.* If the confrontation is found not to be impermissibly suggestive, the trial court need inquire no further. *State v. Leggett*, 305 N.C. 213, 220, 287 S.E.2d 832, 837 (1982). If, however, the pretrial identification procedure is determined to be impermissibly suggestive, the second step requires the court to determine whether, under all the circumstances, the suggestive procedure "gave rise to a substantial likelihood of irreparable misidentification." *Hannah*, 312 N.C. at 290, 322 S.E.2d at 151; *see also State v. Harris*, 308 N.C. 159, 164, 301 S.E.2d 91, 95 (1983). Factors used toward evaluating the likelihood of irreparable misidentification include:

(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Harris*, 308 N.C. at 164, 301 S.E.2d at 95.

Further, if the pretrial identification is found to have been impermissibly suggestive, an in-court identification may still be permitted if the trial court determines by clear and convincing evidence that the

in-court identification is of independent origin. *Harris*, 308 N.C. at 166, 301 S.E.2d at 96; *State v. Clark*, 301 N.C. 176, 183, 270 S.E.2d 425, 429 (1980); *State v. Yancey*, 291 N.C. 656, 660, 231 S.E.2d 637, 640 (1977). In making this determination, the court is not required to declare in writing that the clear and convincing evidentiary standard was applied. *State v. Oliver*, 82 N.C. App. 135, 137, 345 S.E.2d 697, 699 (1986). The factors used to evaluate independent origin are the same as those used to determine whether a pretrial identification procedure results in a likelihood of irreparable misidentification. *Harris*, 308 N.C. at 166, 301 S.E.2d at 96; *State v. Lyszaj*, 314 N.C. 256, 265-66, 333 S.E.2d 288, 295 (1985).

Turning to the first step, the trial court concluded as a matter of law that "[t]he display by Keel to Rowland of a photograph was not done in a manner to be so impermissibly suggestive as to violate any of the defendant's rights to due process of law." Keel asked Rowland if the person in the photograph was the person whom he had observed. Keel showed Rowland the photograph in "an attempt to eliminate the defendant as a suspect as opposed to suggest the defendant as a suspect." Keel did not disclose the identity of the person photographed until after Rowland confirmed the person depicted was the same person Rowland saw on 14 May 1999. Based on all the circumstances, the procedure initiated by Keel was not unnecessarily suggestive and conducive to irreparable mistaken identity. The trial court's findings support its conclusion of law that the identification was not impermissibly suggestive.

Even assuming, *arguendo*, however, that the pretrial identification was impermissibly suggestive, the trial court concluded that the pretrial identification did not result in a likelihood of irreparable misidentification and that Rowland's in-court identification was of independent origin. The trial court's findings of fact support both of these conclusions of law. Turning to the five factors listed above, the trial court found (1) Rowland had sufficient opportunity to observe the man in question on 14 May 1999. He drove by the man twice. In addition, he stopped and spoke with the man for over a minute. While speaking, Rowland stood only ten to twelve feet away. (2) Rowland paid close attention to the man walking along the highway. Initially, Rowland observed the man to the degree necessary to compare the man to one of his friends. As he spoke with the man, Rowland retained specific details as to the man's hair color and clothing. (3) The descriptions provided by Rowland to investigators were found by the trial court to be consistent with later observations made by

Rowland in his testimony. (4) Rowland "expressed that he is 100% certain that the defendant is the person he observed" on 14 May 1999. (5) Finally, although the trial court made no findings with respect to the length of time between the confrontation and the crime, this factor is not determinative when evaluating the totality of the circumstances. These findings support the trial court's conclusions that the pretrial identification did not result in a likelihood of irreparable misidentification and that Rowland's in-court identification was of independent origin. We find no error in the trial court's denial of defendant's motion to suppress.

II.

[3] Defendant next assigns error to the trial court's admission of evidence as to defendant's unauthorized use of church credit cards. The defendant argues that the evidence is irrelevant, unduly prejudicial and shows a propensity for the type of conduct for which defendant is being tried. The decision to admit or exclude evidence is in the sound discretion of the trial court and is reviewed under an abuse of discretion standard. *State v. Smith*, 99 N.C. App. 67, 71, 392 S.E.2d 642, 645 (1990). It must be shown that the "ruling was so arbitrary that it could not have been the result of a reasoned decision." *Id.* (quoting *State v. Thompson*, 314 N.C. 618, 626, 336 S.E.2d 78, 82 (1985)).

Evidence of a prior act or offense is admissible provided it is relevant to any fact or issue other than the character of the accused. *State v. Allen*, 141 N.C. App. 610, 615, 541 S.E.2d 490, 495 (2000). Relevant evidence is evidence tending "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* (quoting N.C. R. Evid. 401).

> Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or [if it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.

*State v. Rose*, 339 N.C. 172, 189, 451 S.E.2d 211, 220-21 (1994) (quoting *State v. Agee*, 326 N.C. 542, 548, 391 S.E.2d 171, 174 (1990)). In cases where a husband is charged with the murder of his wife, "the State may introduce evidence covering the entire period of his

married life to show malice, intent, and ill will toward the victim."
*State v. Braswell*, 312 N.C. 553, 561, 324 S.E.2d 241, 247 (1985).

The evidence established that defendant was issued a credit card for church-related expenses. Defendant used the card for personal purposes. Some of these charges occurred prior to Patty Jo's death. The State offered the evidence as part of the chain of events surrounding the incident as well as motive. The evidence was relevant in showing the financial status of the defendant and his wife before and immediately after the wife's disappearance. From this evidence, the jury could infer that the marriage relationship between defendant and Patty Jo was not as good as shown by defendant's evidence. In addition, defendant's improper use of the credit cards was linked in time and circumstances with the crime. Finally, the evidence was not offered to show, nor does it suggest, a propensity or disposition on the part of the defendant to commit murder. The trial court did not abuse its discretion in admitting the evidence.

## III.

[4] Defendant also assigns error to the admission of communications defendant contends were protected by the clergy-communicant privilege.

> No priest, rabbi, accredited Christian Science practitioner, or a clergyman or ordained minister of an established church shall be competent to testify in any action, suit or proceeding concerning any information which was communicated to him and entrusted to him in his professional capacity, and necessary to enable him to discharge the functions of his office according to the usual course of his practice or discipline, wherein such person so communicating such information about himself or another is seeking spiritual counsel and advice relative to and growing out of the information so imparted, provided, however, that this section shall not apply where communicant in open court waives the privilege conferred.

N.C. Gen. Stat. § 8-53.2 (2005). To fall within the protection of the statute, the defendant must be seeking the counsel and advice of his minister and the information must be entrusted to the minister through a confidential communication. *State v. West*, 317 N.C. 219, 223, 345 S.E.2d 186, 189 (1986).

The clergy-communicant privilege is not applicable in this case. The trial court found, based on competent evidence offered at a *voir*

*dire* hearing, that the purpose of the meeting was "to address issues involving the subject church and the status of the defendant in the administration of such churches' [sic] service." Further, a person to whom the privilege does not extend was present at the meeting between defendant, Rev. Sudduth, and others. This person was a church elder rather than an ordained minister or clergyman. *See State v. Barber*, 317 N.C. 502, 509, 346 S.E.2d 441, 445-46 (1986) (finding no privilege where the communication was made to a member of a church who preached and taught Sunday School but was not an ordained minister or a clergyman). The conversation of the defendant and the clergy, held in the presence of an elder who was not an ordained minister, is one in which the defendant no longer entrusts his admissions solely to the clergy. *West*, 317 N.C. at 223, 345 S.E.2d at 189 (finding a communication between a communicant and a clergy, held in the presence of the communicant's wife, to no longer be entrusted to the clergy as required by the statute). As a result, the clergy-communicant privilege does not apply in this case.

IV.

**[5]** Defendant next assigns error to the State's use of religious references during the trial. The specific incidents to which defendant refers in his brief either resulted in a sustained objection or were not objected to. As for those remarks to which defendant's objections were sustained, no prejudice exists and this Court will not review the propriety of the circumstances. *State v. Roache*, 358 N.C. 243, 296, 595 S.E.2d 381, 415 (2004). The remainder of the remarks occurred in jury selection or closing arguments and were not objected to. As a result of the failure to object, "defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu.*" *State v. Grooms*, 353 N.C. 50, 81, 540 S.E.2d 713, 732 (2000). Defendant must establish that the prosecutor's comments "so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *Id.* (quoting *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998)).

Arguments of counsel are left largely to the control and discretion of the trial judge. *Davis*, 349 N.C. at 44, 506 S.E.2d at 479 (1998). Counsel is permitted "wide latitude in the argument of hotly contested cases." *Id.* Improper biblical remarks occur when the prosecutor argues that the law of this State is divinely inspired or that law officers are ordained by God. *Id.* at 47, 506 S.E.2d at 480 (citations omitted).

In the present case, the prosecutor did not go so far as to claim the State's law or its officers were divinely inspired. Although the closing arguments were colored with biblical references, those references did not rise to the gross impropriety necessary to require the trial court's *ex mero motu* intervention to prevent fundamental unfairness to defendant.

## V.

**[6]** Defendant next argues that he is entitled to a new trial due to an inconsistency between the jurisdictional basis alleged in the indictment and the jurisdictional basis charged to the jury. As a result of defendant's failure to object, we proceed under "plain error" review. *State v. Bagley*, 321 N.C. 201, 212-13, 362 S.E.2d 244, 250-51 (1987) (indicating that plain error must be "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached").

In the present case at issue, the indictment alleged that the offense was committed in Caswell County. The trial judge instructed the jury that "[t]he State has the burden of proving beyond a reasonable doubt that the alleged homicide was committed in North Carolina." The defendant argues that this inconsistency amounts to plain error in the jury instructions. We disagree.

Jurisdiction to hear a case is statewide. *State v. Carter*, 96 N.C. App. 611, 613, 386 S.E.2d 620, 621 (1989) (citations omitted). Determining the proper county in which to bring a criminal action is an issue of venue. *Id.* Improper venue will not deprive the court of jurisdiction. *Id.* The instructions were sufficient as given and did not result in "plain error."

## VI.

**[7]** In his final assignment of error, defendant argues that he received ineffective assistance of counsel at his trial. A defendant's ineffective assistance of counsel claim may be brought on direct review "when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001). If an ineffective assistance of counsel claim is prematurely brought, this Court may dismiss the claim without prejudice, allowing the defendant to reassert the claim during a subsequent motion for appropriate relief proceeding. *State v. Campbell*, 359 N.C. 644, 691,

PRINTING SERVS. OF GREENSBORO, INC. v. AMERICAN CAPITAL GRP., INC.

[180 N.C. App. 70 (2006)]

617 S.E.2d 1, 30 (2005), *cert. denied,* —— U.S. ——, 164 L. Ed. 2d 523, 126 S. Ct. 1773 (2006).

Defendant contends that counsel provided ineffective assistance through inactivity during jury selection, through stipulation to the identity of the victim's remains in exchange for the exclusion of evidence defense counsel later introduced and through reference to an inadmissible polygraph examination during opening statements. In addition, defendant alleges ineffective assistance arising out of unrecorded bench conferences concerning evidentiary matters. Each of the specific areas in which defendant claims his counsel's performance was deficient involved counsel's trial strategy. In matters of trial strategy, counsel is given wide latitude and there is a presumption that counsel's performance is within the boundaries of reasonable professional assistance. The record before us is insufficient for us to determine whether counsel's conduct was objectively deficient, and, if so, whether it deprived defendant of a fair trial. *See Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674 (1984). The merits of defendant's claim, if any, cannot be determined from the "cold record" and require further evidentiary development. Therefore, we dismiss defendant's assignments of error relating to his ineffective assistance of counsel claim, without prejudice to his right to assert them in a motion for appropriate relief pursuant to N.C. Gen. Stat. § 15A-1411 *et seq.* (2005).

No error.

Judges ELMORE and LEVINSON concur.