An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-115-2

Filed 16 July 2025

Wake County, No. 19CRS223407

STATE OF NORTH CAROLINA

v.

ANDRE EUGENE LESTER

Appeal by defendant from judgment entered 21 July 2022 by Judge Thomas H. Lock in Wake County Superior Court. This case was originally heard in the Court of Appeals on 20 September 2023. *See State v. Lester*, 291 N.C. App. 480, 895 S.E.2d 905 (2023). Upon remand from the Supreme Court of North Carolina. *State v. Lester*, 387 N.C. 90, 910 S.E.2d 652 (2025).

> *Attorney General Jeff Jackson, by Deputy General Counsel Tiffany Y. Lucas, and General Counsel Fellow Zachary R. Kaplan, for the State.*
>
> *Mark L. Hayes, for the defendant-appellant.*

TYSON, Judge.

This case returns to this Court by opinion and remand by the Supreme Court of North Carolina. *State v. Lester,* 387 N.C. 90, 910 S.E.2d 642 (2025). Our review discerns no error.

## I.  Background

Andre Eugene Lester ("Defendant") appeals from judgments entered upon a jury's verdicts finding him guilty of statutory rape of a child, statutory sex offense with a child, and indecent liberties with a child.

The factual background is set forth in this Court's previous opinion:

> Thirteen-year-old Riley lived in an apartment in Cary with her father and her fifteen-year-old brother.  (Pseudonym is used to protect the identity of minors.  N.C. R. App. P. 42(b).  Riley's father worked during the day and left his children at home alone after school.  Riley's mental health diagnoses included major depressive disorder without psychosis, which had previously required "several inpatient psychiatric hospitalizations." Riley also exhibited signs of cutting herself.
>
> Riley's father took her to a Duke Hospital Clinic ("Duke") in the summer of 2019.  Riley privately met with Kristen Russell ('Russell"), a social worker.  Russell inquired of Riley about her sexual health and experiences.  Riley asserted she had previous sexual experiences with a man around thirty years old.  Riley told Russell she did not believe this experience was wrong and did not want to tell an adult.  Duke is a mandatory reporter of alleged sexual assaults and reported her allegations to Riley's father and to law enforcement officers.  Riley was referred to and interviewed at the SAFEchild Advocacy Center.
>
> Cary Police Corporal Armando Bake received Russell's report on 12 September 2019 at the Juvenile Crimes Unit.  Corporal Bake spoke with Riley, her father, and her brother.  Riley's brother identified the alleged perpetrator as "Ray-Ray," and he informed Corporal Bake "Ray-Ray" was currently in jail for an alleged robbery.
>
> Riley told Corporal Bake that she and "Ray-Ray" had communicated *via* text messages and cellular phone calls.

Riley also gave Corporal Bake her and "Ray-Ray's" cell phone numbers. Corporal Bake contacted Cary Police Detective Jim Young, who was investigating [an] alleged robbery. Detective Young identified "Ray-Ray" as Defendant and also confirmed his date of birth and his cell phone number.

Corporal Bake and Detective John Schneider obtained a court order requesting Defendant's cell phone records from Verizon from May 2019 until July 2019. The officers used PenLink, a computer program, to create a derivative record showing communications between Defendant's and Riley's cellular phones. PenLink derived "over 100 communications . . . between the two phones" within the May to July 2019 time period.

Riley testified she and her brother used their apartment as a "crack house," bringing people over for "drugs and sex," while their father was [ ] working. Riley initially met then thirty-two-year-old Defendant at a hotel through her brother. Riley later encountered Defendant outside near the family's apartment, while she was walking her dog during the summer of 2019. After "small talk," Defendant told Riley [ ] he was waiting to meet her brother. Riley "offered to let [Defendant] wait in the house because it was hot outside."

Riley and Defendant talked, which "led to [Riley] doing a tarot card reading" for Defendant. Riley displayed a tarot card, which "had a naked lady on it," and which steered the conversation towards the topic of sex. Riley produced and showed Defendant her "pleasure toys." Riley asked Defendant if he wanted to have sex. Defendant agreed, and the two went into Riley's brother's bedroom and allegedly engaged in multiple acts of fellatio and intercourse.

Riley allegedly told her brother what had occurred when he arrived home a short time later. Neither Riley nor her brother told their father or any other adult about the allegations until her visit at Duke, because she was "scared." Defendant received Riley's cell phone number

from her brother and began to communicate with her.

Defendant was indicted for statutory rape of a person fifteen years or younger, statutory sexual offense with a child fifteen years or younger, and indecent liberties with a child.

During pre-trial proceedings on the day trial was scheduled to begin, Defendant's attorney stated: "Your honor, the defendant requests that I move to withdraw, so I move to withdraw." Defendant's attorney stated he had been representing Defendant for several years in multiple different cases. Defendant's attorney asserted this representation had begun cordially, but their relationship had become difficult after Defendant had "refused to talk to him." Defendant's attorney stated he had received all discovery materials and an offer of a plea agreement from the State, which he had forwarded to Defendant. Defendant's attorney stated he was familiar with the case and was fully prepared to try the case.

Defendant stated his counsel had not come to see him much and had "yelled" at him during a visit. Defendant disagreed with his counsel's trial strategy, specifically his counsel's refusal to challenge the indictment and to file a motion for discovery. Defendant acknowledged receipt of all materials provided by the State, including a plea offer and agreement.

The trial court denied Defendant's counsel's motion to withdraw, trial proceeded, and a jury convicted Defendant of all three charges. The trial court consolidated his convictions for statutory rape of a person fifteen years or younger and statutory sexual offense with a child fifteen years or younger and sentenced Defendant to an active sentence of 317 to 441 months imprisonment. Defendant was also sentenced to 21 to 35 months active imprisonment for the indecent liberties with a child conviction, the sentences to run consecutively. Defendant appeals.

*State v. Lester*, 291 N.C. App. 480, 481-83, 895 S.E.2d, 905, 906-08 (2023), *rev'd*, 387

N.C. 90, 910 S.E.2d 642 (2025).

This Court previously and unanimously held the State had failed to show the Constitutional confrontation clause error was harmless beyond a reasonable doubt and awarded Defendant a new trial. *Id.* at 489-90, 895 S.E.2d at 911-12. The State sought review before the Supreme Court of North Carolina, which held the admitted exhibits did not violate the Confrontation clause or hearsay rules and remanded the case to this Court to review Defendant's remaining issues. *Lester*, 387 N.C. at 103, 910 S.E.2d at 652.

## II.     Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b)(1) (2023).

## III.     Issues

Defendant argues the trial court erred by: (1) admitting hearsay evidence to link him to a phone number; (2) allowing an in-court identification based on an impermissibly suggestive pre-trial procedure; (3) denying his motion to have his attorney withdraw as counsel; and, (4) denying his motion for a new appointed attorney.

## IV.     Hearsay Evidence

Defendant argues the trial court improperly admitted the hearsay evidence linking Defendant to a phone number ending in *1545. Defendant asserts hearsay evidence was improperly admitted under Rule 406. N.C. Gen. Stat. § 8C-1, Rule 406 (2023).

## A. Standard of Review

"The admission of evidence alleged to be hearsay is reviewed *de novo* when preserved by an objection." *State v. Smith*, 289 N.C. App. 233, 249, 888 S.E.2d 706, 719 (2023) (quoting *State v. Harris*, 253 N.C. App.322, 327, 800 S.E.2d 676, 680).

## B. Analysis

Hearsay testimony and evidence is inadmissible, except as is allowed by specific statutory exceptions. N.C. Gen. Stat. § 8C-1, Rule 802 (2023). Such exceptions are provided by Rules 803 and 804. N.C. Gen. Stat. § 8C-1, Rules 803 and 804 (2023). As a separate matter, Article 4 of the Rules of Evidence provides guidance regarding the admissibility of evidence based on its relevance. N.C. Gen. Stat. § 8C-1, Art. 4 (2023). Rule 406 provides: "Evidence of the habit of a person or of the routine practice of an organization . . . is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." N.C. Gen. Stat. § 8C-1, Rule 406 (2023). Rule 406 does not provide an exception to the inadmissibility of hearsay. *Id.*

The trial court's admission of the hearsay records was improper under Rule 406. *Id.* However, this admission does not arise to prejudicial error, as the evidence could have been properly admitted under the recorded recollection exception to hearsay. N.C. Gen. Stat. § 8C-1, Rule 803(5) (2023).

The recorded recollection exception provides a "memorandum or record concerning a matter about which a witness once had knowledge but now has

insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly" is not excluded by the hearsay rule. *Id.*

To admit hearsay testimony under this exception, the State must show:

> (1) the evidence "pertain[s] to matters about which the declarant once had knowledge; (2) the declarant does not now have sufficient recollection of the matters; and (3) the evidence was made by declarant, or if made by someone other than declarant, was examined and adopted ... when the matters were fresh in [declarant's] memory[,]" and "reflect[ed] [declarant's] knowledge correctly.

*Smith*, 289 N.C. App. at 250, 888 S.E.2d at 720 (quoting *State v. Love*, 156 N.C. App. 309, 314, 576 S.E.2d 709, 712 (2003)).

Detective Young testified he had obtained Defendant's phone number during interrogation and confirmed the phone number was associated with a phone carried by Defendant when he was brought to the police department. He further testified, while he did not remember specific details of the interview, he was confident he had interrogated Defendant, and he could "refer to [his] notes as to what information [he had] gathered." Detective Young reiterated this was "standard practice," and "if [he] dr[e]w an arrow and . . . wr[o]te the words 'belongs to Lester' coming from the cell phone number," he was confident the "cell phone number belongs to the individual to who [he had] referred to."

Such testimony tends to show the evidence could have been properly admitted as a recorded recollection exception to hearsay. *Id.* Despite being admitted under an

improper rule of evidence, the evidence linking Defendant and his cellphone to the *1545 telephone number would not have been excluded as inadmissible hearsay. N.C. Gen. Stat. § 8C-1, Rule 803(5) (2023). *See State v. McGraw*, 137 N.C. App. 726, 731, 529 S.E.2d 493, 498 (2000) (explaining when "evidence was improperly admitted, but could have been admitted under a rule that no one realized at the time of trial" and there is no error "in the substance of the case," this Court is not "precluded from applying a rule that allows for admission of the evidence"). Defendant's argument of prejudice is overruled.

## V. Motion to Suppress

Defendant argues the trial court erred in denying his motion to suppress a witness's in-court identification because it was impermissibly tainted by a previous out-of-court identification.

## A. Standard of Review

"We review a trial court's ruling on a motion to suppress to determine whether competent evidence supports any challenged finding of fact and whether the valid findings support the trial court's conclusions of law, which are reviewed *de novo*." *State v. Siler*, 295 N.C. App. 262, 263, 905 S.E.2d 282, 284 (2024). "The trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Haislip*, 362 N.C. 499, 500, 666 S.E.2d 757, 758 (2008) (quotation marks omitted).

## B. Analysis

While sitting in the back of the courtroom during a pre-trial hearing on 18 July 2022, Riley identified Defendant as the alleged perpetrator. Riley again identified Defendant in court as her purported assailant the next day. Defendant objected on the grounds the pre-trial identification impermissibly interfered with Riley's in-court identification. A *voir dire* hearing was conducted, during which Riley testified and was cross-examined by Defendant. Riley's testimony was accepted by the trial court, and she was allowed to identify Defendant as the perpetrator in front of the jury. Defendant appeals the trial court's acceptance of Riley's identification, arguing that the trial court failed to enter sufficient findings of fact to support admission of Riley's identification.

### 1. Findings of Fact

N.C. Gen. Stat. § 15A-974(b) mandates a trial court must enter findings of fact into the record when ruling upon a motion to suppress. N.C. Gen. Stat. § 15A-974(b) (2023). This provision has been interpreted to apply only when there is a material conflict in the evidence in the record to be resolved. *See State v. Ladd*, 308 N.C. 272, 278, 302 S.E.2d 164, 168 (1983). When material conflicts in the evidence exist, the "trial judge *must* make such factual findings to resolve the conflict and to reflect the bases for his ruling." *Id.* However, if the trial court "provides the rationale for its ruling from the bench and there are no material conflicts in the evidence, the court is not required to enter a written order." *State v. Parker*, 277 N.C. App. 531, 537, 860 S.E.2d 21, 27 (2021) (quoting *State v. Wainwright*, 240 N.C. App. 77, 83, 770 S.E.2d

99, 104 (2015)). In such cases, "the trial court's findings can be inferred from its decision." *State v. Bartlett*, 368 N.C. 309, 312, 776 S.E.2d 672, 674 (2015).

A material conflict exists when "evidence presented by one party controverts evidence presented by an opposing party such that the outcome of the matter to be decided is likely to be affected." *Parker*, 277 N.C. App. at 537, 860 S.E.2d at 27. For example, discrepancies in a defendant's and an arresting officer's testimony regarding key factual issues (*e.g.,* number of officers present during arrest) created a material conflict. *State v. Baker*, 208 N.C. App. 376, 385-87, 702 S.E.2d 825, 831-32 (2010). In *State v. Jacobs*, 174 N.C. App 1, 260 S.E.2d 204 (2005), *rev'd and vacated in part on other grounds*, 361 N.C. 565, 648 S.E.2d 841 (2007), no material conflict existed when "the only evidence . . . consisted of the undisputed testimony of law enforcement officers, and the defendant offered no evidence of his own (though he did briefly cross-examine the officers)." *Parker*, 277 N.C. App. at 538, 860 S.E.2d at 27 (summarizing the holding of *Jacobs*).

Finally, in *Parker*, the defendant argued evidence of the similarities between the smells of legal hemp and marijuana introduced a material conflict regarding whether the smell of marijuana was sufficient to support probable cause. *Id.* Though the Court in *Parker* acknowledged such a conflict may have called into question the State's legal theory, the conflict was not a material issue. *Id.*

Here, no material conflict exists in the evidence because Defendant introduced no evidence during the *voir dire* hearing. Because Defendant failed to introduce

- 10 -

evidence creating a material conflict of facts, and the trial court adequately explained its rationale, the trial court was not required to enter a written order in denying Defendant's motion to suppress. *Id.*; N.C. Gen. Stat. § 15A-974(b) (2023). Defendant's argument is overruled.

### 2. *Conclusions of Law*

We review whether the court's factual findings support the court's legal conclusion the pretrial identification procedure did not deny Defendant his due process. The question before the trial court concerned the nature and impact of Riley's pretrial identification on her in-court identification.

A two-part inquiry determines if a pretrial identification denied a defendant due process. *State v. Pulley*, 180 N.C. App. 54, 64, 636 S.E.2d 231, 239 (2006). First, the inquiry is "whether an impermissibly suggestive procedure was used in obtaining the out-of-court identification." *Id.* If the pretrial identification was not impermissibly suggestive, then the evidence is properly admitted, and no further analysis is required. *Id.*

If the pretrial identification is determined to be impermissibly suggestive, the court must further determine whether, considering the totality of the circumstances, the suggestive procedure "gave rise to a substantial likelihood of irreparable misidentification." *Id.* If so, the court determines whether the procedure and the surrounding circumstances were so suggestive as to "offend fundamental standards of decency and justice." *Id.*

- 11 -

In making this determination, courts must consider:

> (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and[,] (5) the length of time between the crime and the confrontation.

*Id.* (quoting *State v. Harris*, 308 N.C. 159, 164, 301 S.E.2d 91, 95 (1983)).

Here, the trial court's findings of fact were "consistent with the witness's testimony in court th[at] day." The court specified the "length of time of the events which occurred in 2019 giving rise to these charges, including where the events occurred, the lighting conditions, the nature of the alleged events, and the witness's opportunity to observe the perpetrator of the crimes charged." The court relied upon the witness's testimony regarding "the events that occurred yesterday in this courtroom for approximately an hour and half and had the opportunity from her position in the rear of the courtroom to view the defendant."

The court's findings of fact set out the court's reasoning, the testimony provided by the witness, and the basis for its ultimate ruling. Regarding the witness's opportunity to view the criminal at the time of the crime and the witness's degree of attention, the trial court found: (1) the witness and the perpetrator had spent five to ten minutes outside in the mid-day sun before going inside; (2) the witness and the perpetrator sat indoors and talked for twenty to thirty minutes before having sex; (3) the pair had sat opposite to each other while speaking; (4) the witness had a clear

view of the perpetrator for the duration of their conversation; (5) the witness and the perpetrator engaged in oral sex and vaginal intercourse for twenty to thirty minutes; and, (6) the witness and the perpetrator engaged in approximately five minutes of conversation after having intercourse, amounting to between 50 and 75 total minutes of close-proximity daytime interaction.

Regarding the level of certainty demonstrated by the witness at the confrontation, Riley testified, after getting a clear view of Defendant's face, she was able to identify him as the perpetrator. Riley confirmed she was certain of her identification, because "he looks just like him." Finally, the witness reiterated she had no doubts about her identifications of Defendant based upon his appearance.

Defendant argues the court also found Riley had incorrectly recalled aspects of the perpetrator's appearance and three years had passed between the purported crimes and her identification of him. The trial court's findings of fact are supported by competent evidence and sufficiently support the conclusion Riley's pretrial identification did not cause irreparable misidentification. No single element is dispositive when considering the totality of the circumstances. *Pulley*, 180 N.C. App. at 64, 636 S.E.2d at 239. Defendant's argument is overruled. *Id.*

## VI.   Defendant's Request to Substitute Counsel

Defendant argues the trial court erred in denying his request to substitute appointed counsel. Defendant asserts the trial court erred in treating his appointed counsel's motion to withdraw and his own request to substitute counsel as a single

request and the trial court prejudicially erred in denying both motions.

## A. Standard of Review

"We review the denial of a defendant's request for the appointment of substitute counsel for an abuse of discretion." *State v. Holloman*, 231 N.C. App. 426, 429, 751 S.E.2d 638, 641 (2013).

## B. Analysis

Defendant argues the trial court prejudicially erred in considering counsel's motion to withdraw and his request for new counsel together.

### 1. Motion to Withdraw

The Sixth Amendment to the Constitution of the United States and Article I, §§ 19, 23 of the North Carolina Constitution expressly guarantee a defendant's right to counsel in serious criminal matters. *State v. Blakeney*, 245 N.C. App. 452, 495, S.E.2d 88, 93 (2016). The right to counsel includes not only the right to appointed counsel, but also the right to retain counsel if the defendant can afford it, and a defendant's right to proceed *pro se* without representation. *State v. Harvin*, 268 N.C. App. 572, 590-91, S.E.2d 899, 909-10 (2019).

A defendant is entitled to discharge his attorney and proceed *pro se,* even when his purported dissatisfaction is "completely unjustified." *State v. Robinson*, 290 N.C. 56, 67, 224 S.E.2d 174, 180 (1976). The right to court-appointed counsel does not include the right to counsel of the defendant's choice. *State v. Thacker*, 301 N.C. 348, 351-52, 271 S.E.2d 252, 255 (1980). "In the absence of any substantial reason for the

appointment of replacement counsel, an indigent defendant must accept counsel appointed by the court, unless he wishes to present his own defense." *State v. Hutchins*, 303 N.C. 321, 335, 279 S.E.2d 788, 797 (1981).

"Given the fundamental nature of the right to counsel, we ought not to indulge in the presumption that it has been waived by anything less than an express indication of such an intention." *Id.* at 339, 279 S.E.2d at 800. Even "[s]tatements of a desire not to be represented by court-appointed counsel do not amount to expressions of an intention to represent oneself." *Id.* at 335, 279 S.E.2d at 797. Instead, a defendant must make "*some* form of an affirmative statement" to indicate "a desire to proceed *pro se*." *Id.* at 338, 279 S.E.2d at 799.

In *Hutchins*, the defendant had expressed dissatisfaction with his appointed counsel and indicated to the court he wished for his attorney to be removed. *Id.* at 339, 279 S.E.2d at 799. The next day, the defendant requested new counsel be appointed. *Id.* The request for new appointed counsel "negate[d] any inference that [the] defendant was voluntarily electing to represent himself." *Id.* at 339, 279 S.E.2d at 800.

Defendant made no affirmative statement indicating he desired to proceed *pro se* and represent himself or to privately retain counsel. Instead, Defendant privately conferred with his appointed counsel Kelly during a pretrial hearing for a period of about six seconds. At the conclusion of this conversation, Kelly moved to withdraw, telling the court: "the defendant requests that I move to withdraw."

In the absence of an affirmative declaration to hire new counsel or to proceed *pro se*, Defendant's motion is properly construed as a motion for substituted counsel. This conclusion is bolstered by Defendant's subsequent request for new counsel to be appointed.

Defendant's own words support this interpretation. When Defendant was asked to explain his side of the story, he ended by saying "[s]o, again, I do ask for a new attorney if possible. If not, then, you know, this is what I have to live with, you know." Defendant's own interpretation of Kelly's motion to withdraw rested upon an understanding, if the motion were allowed, Kelly would be replaced by another appointed counsel.

Far from the full day separating the defendant's motion to withdraw and the request for new counsel in *Hutchins*, Defendant's request for new counsel followed a mere fifteen minutes after Kelly's motion to withdraw at Defendant's urging. Kelly's motion to withdraw was properly interpreted in conjunction with Defendant's motion for substituted counsel.

### 2. Request to Substitute Counsel

The Sixth Amendment's right to counsel does not include the absolute "privilege to insist that counsel be removed and replaced with other [court-appointed] counsel." *State v. Sweezy*, 291 N.C. 366, 371, 230 S.E.2d 524, 528 (1976). Instead, a defendant must show "good cause" to warrant replacement of appointed counsel. *Holloman*, 231 N.C. App. at 430, 751 S.E.2d at 641. Examples of "good cause" include

conflicts of interest, "complete breakdown[s] in communication," or irreconcilable conflicts. *Id.* In such circumstances, representation by original counsel would "amount to denial of defendant's right to effective assistance of counsel." *State v. Gentry*, 227 N.C. App 583, 588, 743 S.E.2d 235, 239 (2013).

Denial of a request for substitute counsel is proper when "it appears that counsel is reasonably competent and there is no conflict between defendant and appointed counsel that renders counsel ineffective to represent defendant." *Holloman*, 213 N.C. App. at 430, 751 S.E.2d at 641.

Mere disagreement between a defendant and his court-appointed counsel concerning trial tactics or dissatisfaction with his attorney's work is not sufficient to entitle a defendant to a new appointed counsel. *Id.* at 431, 751 S.E.2d at 642. The court "must satisfy itself only that present counsel is able to render competent assistance and that the nature or degree of the conflict is not such as to render that assistance ineffective" to properly deny a request to substitute counsel. *State v. Rogers*, 194 N.C. App. 131, 137, 669 S.E.2d 77, 81 (2008).

The bar a defendant must surmount to show their counsel is ineffective is high. In *Hutchins*, the defendant was dissatisfied with his representation and sent a letter to his appointed counsel that read: "I am fire (sic) you from my case. I'll not (sic) to court with you as my Lawyer. You have lie (sic) to my mother in other worlds (sic) I don't need you any more at all. that is that. good bye. (sic)". *Hutchins*, 303 N.C. at 360, 279 S.E.2d at 811-12.

In court, the defendant in *Hutchins* had requested a new court-appointed attorney, claiming his lawyers had "promised this and promised that, and none of them have come through." *Id.* at 331, 279 S.E.2d at 795. He alleged he and his counsel had not "talked over the case at all," informing the court: "I can't trust them any more." *Id.* at 332, 279 S.E.2d at 795-96. He further complained his counsel had not kept him informed of pre-trial proceedings and had not visited him while in jail. *Id.* at 332-33, S.E.2d at 796.

Frustration with the attorney-client relationship in *Hutchins* was not limited to the defendant. The defendant's appointed counsel stated:

> *[Defendant] and I have reached a state where we have an absolute lack of communication.* That he has personal – a feeling personal against me as opposed to all other persons in his acquaintance; a lack of trust. He doesn't feel he can place trust of his situation, his case in my hands. As a result, *that has put me in a position where – with the lack of communication am unable to prepare effectively for the defense of this case.*
>
> . . .
>
> *I'm not able to communicate with [my client], whatsoever, it makes it, at this point, a physical impossibility, as well as a legal impossibility, in my opinion, to adequately prepare a defense on behalf of [my client.]*

*Id.* at 360-61, 279 S.E.2d at 812 (Exum, J., dissenting).

A breakdown in communication this extensive in *Hutchins* was not enough to overturn the trial court's denial of the defendant's request for substitution of appointed counsel. *Id.* at 337, 279 S.E.2d at 798. Nothing about these conflicts

indicated "defense counsel [was] unable to mount a defense which would be consistent with the concept of effective representation." *Id*. at 336, 279 S.E.2d at 798. "Defense counsel had been diligent in all respects regarding their preparation for trial." *Id*. at 336-37, 279 S.E.2d at 798. Defense counsel "engaged in spirited motions practice and discovery," and there was "no indication that the frequency of contact resulted in defendant being misinformed about the progress of the case." *Id*. at 337, 279 S.E.2d at 798. Nor was there "any suggestion that the level of contact affected adversely the attorneys' preparation for trial." *Id*.

Here, Defendant's relationship with his appointed counsel, Kelly, resembles the relationship between defendant and appointed counsel in *Hutchens*. Defendant claimed Kelly had "yelled" at him and "was real aggressive." Defendant further alleged Kelly had not "come to see [him] much." Defendant complained, "I don't see him" or "hear from him," and "the only time we speak is five minutes before I come to court."

Poor communication between Defendant and Kelly was further corroborated by Kelly's statements in court. Kelly informed the court their relationship had "been difficult" because of Defendant's refusal to speak to him "for the past few years." Attorney Kelly elaborated for "the past two years, when I go to the jail, he refuses to see me. So I haven't talked to him."

Despite the clear communication problems Defendant and Kelly experienced, the court acted within its discretion to deny Defendant's request for substitute

counsel.

Kelly testified he had communicated a plea offer to Defendant and Defendant had expressed his desire to go to trial to Kelly. Since that time, around a year before the hearing, Kelly had presumed the case would go to trial. Kelly testified that he had been able to prepare for trial without Defendant's co-operation. Defendant testified while he and Kelly had rarely talked, Kelly had sent him documents including the indictment, a motion for discovery, and the State's plea offer.

The trial court found "Kelly has been practicing law . . . in North Carolina since [1984], that he has represented hundreds of defendants . . . and has tried dozens of jury trials." The court further found Kelly "has represented Defendant in this matter since . . . the date of the indictment [more than two years ago]" and he "is prepared to try this case." Finally, the court found "there has not been such an irreconcilable conflict between counsel and Defendant so as to prevent Kelly from being able to effectively represent Defendant."

Defendant's statements and expressions of dissatisfaction with Kelly's work and their disagreement over trial tactics do not entitle Defendant to the appointment of substitute counsel. *Id*. at 337, 279 S.E.2d at 798. Regarding the denial of a request to substitute counsel, "appellate courts ought to be reluctant to overturn the action of the trial judge." *Id*. at 337, 279 S.E.2d at 798. "Such deference recognizes the superior viewpoint [of the trial judge as] one who is on the scene . . . as compared with the reviewer of a cold record." *Id*. Defendant's argument is overruled. *Id*.

## VII.    Conclusion

The trial court did not prejudicially err in admitting evidence linking Defendant and his cell phone to the *1545 telephone number, which had communicated with Riley's cellphone.  The court properly denied Defendant's motion to suppress Riley's identification and allowed Riley's in-court identification of Defendant.  The trial court did not abuse its discretion by denying Defendant's motion to substitute appointed counsel and his appointed counsel's motion to withdraw.

Defendant received a fair trial, free from prejudicial errors he preserved and argued.  We find no error in the Defendant's convictions or in the judgments entered thereon.  *It is so ordered.*

NO ERROR.

Judges COLLINS and WOOD concur.

Report per Rule 30(e).