**Opinion issued July 17, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00389-CR

———————————

**COREY LEWIS CAMPBELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 232nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1673575**

---

## MEMORANDUM OPINION

A jury convicted Corey Lewis Campbell of murdering Darlene Solis, a Houston-area woman he was dating. The State presented evidence that Campbell fatally shot Solis during an argument, fled to his mother's home in North Carolina, and then admitted to Solis's murder in a telephone call with the bishop of his

mother's church. On appeal, Campbell argues the murder conviction must be set aside because the trial court allowed the bishop to testify even though Campbell's statements to him are privileged under North Carolina law, and then refused to submit jury questions on the lesser-included offenses of criminally negligent homicide and manslaughter even though the evidence required them.

Because the trial court did not err in either respect, we affirm.

## I. Background

Before trial, Campbell moved to suppress his conversation with the bishop under the clergy-communicant privilege, which, described generally, protects confidential communications between a member of the clergy and a person seeking spiritual guidance. The trial court, applying North Carolina law, denied the motion to suppress, concluding the privilege did not shield Campbell's statements to the bishop for three reasons: (1) Campbell had no preexisting relationship with the bishop; (2) Campbell was seeking advice, not spiritual guidance, from the bishop; and (3) the bishop testified at the suppression-hearing that Campbell's mother was on the call, destroying any expectation of confidentiality.

The bishop testified at trial, over objection, that Campbell's mother called the day after the murder and asked him to talk to her son. Although Campbell's mother attended the bishop's church, the bishop had never met Campbell. Campbell admitted to the bishop over the phone that he had murdered someone. The bishop

2

asked Campbell what happened. Campbell responded that he had "popped off" and "shot the young girl"—his girlfriend—"three times" during an argument. Campbell also shared that, after the shooting, he threw the gun under a bed and took off. In the bishop's view, Campbell admitted the murder at his mother's urging and was neither remorseful nor seeking spiritual guidance. Although Campbell did not ask him to, the bishop told Campbell that he would pray for him and further advised him to consult a lawyer and turn himself in.

The State's theory was that Campbell murdered Solis because he was jealous. Solis and Campbell met in a bar and began dating. Several witnesses, including Campbell himself, described the relationship as "up and down" or "off and on." Solis's friends noticed jealous, angry, or controlling behavior from Campbell, followed by attempts to win back Solis with gifts when she became disinterested. During their "off" periods, Solis and Campbell both dated other people. Solis became involved with two other men—one of whom she was growing more serious about—while she was still dating Campbell. Campbell knew about the other men but claimed he "got over it" after talking with Solis.

At the time of the shooting, Campbell was staying temporarily in Solis's apartment and storing his belongings there, including a Glock .40-caliber pistol and two other firearms. Campbell testified that he is not a "gun expert" but kept the Glock for "home defense," "ready to go" with an extended clip in the chamber.

3

Campbell acknowledged arguing with Solis about their relationship on the day of the shooting because both were "cheating." According to the State, Campbell retrieved the loaded Glock during his argument with Solis, confronted her in the bathroom, and shot her four times at close range (once in the head and three times in the chest).

Campbell gave a different account of the shooting. He said that while his argument with Solis began in the kitchen, he had moved away from Solis into the bedroom to watch TV in an attempt to ignore her. But she continued to argue with him, and he became concerned neighbors might call the police. He got out of bed and found Solis in the bathroom, where she was still "screaming" at him as she put her makeup on. Solis was seated on the counter facing the mirror, but Campbell could see her face in the mirror's reflection as he leaned on the doorjamb.

According to Campbell, Solis reached for something with her right hand and told him to "shut the fuck up." Campbell realized the object Solis had reached for was his Glock, which she pointed at him with her finger on the trigger. Asked on direct examination what happened next, Campbell testified:

> [M]y first instinct is, oh my God. I know that gun is loaded and ready to go. She pointed right in my face and I took my left hand and deflected it away from me. I tried to move the momentum.

As he hit the "barrel of the gun" away, he heard it "go off." He grabbed the longest part of the gun—the extended clip—and then "got [his other] hand like on the back

4

of hers . . . on top of hers." They went "back and forth," with Campbell trying to wrest the Glock from Solis. During this struggle, he believes "another one of her fingers" or her thumb "slipped into the trigger" and three more shots were fired. Campbell fell back into the hall, and Solis fell the opposite direction. Unsure if he had been shot, Campbell checked himself for wounds and then checked on Solis. She was deceased.

Campbell testified that he panicked, threw the gun under the bed, grabbed his car keys, and drove toward his family home in North Carolina. Throughout his testimony on direct and cross-examination, Campbell maintained that Solis accidentally shot herself and denied that he shot her. He further testified that he had not done anything intentionally, recklessly, or negligently, and did not "know that in the course of that struggle . . . the gun might go off and fire." Campbell claimed that he feared for his life when Solis pointed the Glock at him and as he attempted to take the gun from her: "I was trying to get the gun away from her. So I was still in fear for my life. I didn't want anybody to get hurt sir."

Campbell further testified that, after he arrived in North Carolina, his mother put him on the phone with the bishop and then left the room. Campbell hesitated at first to talk to the bishop but felt he needed prayer, and the bishop told him the conversation was confidential, "like a doctor or a lawyer." Campbell testified that

5

he gave the bishop a "very brief" "synopsis of what had happened" but denied that he shared many details, like the number of times Solis was shot.

The jury convicted Campbell of murder and assessed his punishment at forty years' confinement.

## II. Motion to Suppress

In his first issue, Campbell argues that the trial court should have suppressed the bishop's testimony because North Carolina's clergy-communicant privilege renders his confession to the bishop inadmissible.

### A. Standard of review

We use a bifurcated standard of review for a trial court's ruling on a motion to suppress evidence. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). At the suppression hearing, the trial court is the sole factfinder and judge of the credibility of the witnesses and the weight of their testimony. *Id.* at 190. We afford almost complete deference to the trial court's determination of historical facts. *Id.* But we review de novo the legal significance of the facts found by the trial court. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 35 (Tex. Crim. App. 2017).

### B. The trial court did not err by allowing the bishop's testimony

The parties seem to agree (and so do we) that North Carolina law determines whether Campbell's statements to the bishop are privileged because the conversation took place there, making North Carolina the state with the most significant

6

relationship with the statements. *See Gonzalez v. State*, 45 S.W.3d 101, 106–07 (Tex. Crim. App. 2001) (courts considering whether a communication is privileged should apply the law of the state with the most significant relationship with the communication, which generally is the state where the communication took place).

North Carolina's clergy-communicant privilege is codified in the General Statutes. N.C. GEN. STAT. § 8–53.2. It prohibits a member of the clergy, like the bishop, from testifying about information "communicated to him and entrusted to him in his professional capacity, and necessary to enable him to discharge the functions of his office according to the usual course of his practice or discipline," when the person communicating the information "is seeking spiritual counsel and advice relative to and growing out of the information so imparted." *Id.* There are two requirements for the privilege to apply: (1) the communicant must be seeking spiritual counsel from the minister in his professional capacity; and (2) the information must be entrusted to the clergy member as a confidential communication. *State v. West*, 345 S.E.2d 186, 189 (N.C. 1986). Assuming without deciding that the first requirement is satisfied, we conclude the second requirement is not.

At the suppression hearing, the bishop testified that Campbell's mother was on the line when he talked to Campbell. The prosecutor expressly asked the bishop, "do you know if [Campbell's mother] was still in the room at that time?" The bishop

7

responded, "She was still on the phone I know that." He explained that the phone was "on speaker" and Campbell's mother interjected with comments during the conversation. As the factfinder, the trial court could (and did) believe the bishop's suppression-hearing testimony, finding that Campbell's mother was on speakerphone or in the room with him when he talked to the bishop even though Campbell testified he was alone. *See Lerma*, 543 S.W.3d at 190. We defer to the trial court's finding. *See id.*

Under North Carolina law, the presence of Campbell's mother on the call destroys the privilege because a communicant cannot "expect confidentiality when the disclosures [to clergy] are made in the presence of a third party." *State v. Crisco*, 777 S.E.2d 168, 173 (N.C. Ct. App. 2015); *see West*, 345 S.E.2d at 189 (clergy-communicant privilege did not apply when preacher's wife was present and thus defendant's admissions to preacher were not "entrusted" to preacher for purpose of spiritual counsel and advice).

Campbell cites case law holding that a defendant must waive the privilege in open court before a clergy member can testify. But that law—and the statutory language it depends on—regards communications that are privileged in the first instance. In *State v. Andrews*, the trial court did not err in allowing a reverend to testify because, although the defendant's communications with the reverend were privileged, defense counsel withdrew his objection and waived the privilege in open

8

court. 507 S.E.2d 305, 308–09 (N.C. Ct. App. 1998). The trial court's authority to allow the reverend's testimony despite the privilege rested on the statute's instruction that the privilege "shall not apply where communicant in open court waives" it. N.C. GEN. STAT. § 8–53.2. In contrast here, the privilege does not protect Campbell's statements to the bishop in the first instance, so no open-court waiver was needed to admit the bishop's testimony.

The trial court therefore did not abuse its discretion by denying Campbell's motion to suppress the bishop's testimony. We overrule Campbell's first issue.

### III. Jury Charge

In his second and third issues, Campbell contends the trial court erred by denying his requests for jury instructions on the lesser-included offenses of manslaughter and criminally negligent homicide.

#### A. Standard of review

We review the trial court's decision to deny the inclusion of lesser-included-offense instructions for an abuse of discretion. *Steele v. State*, 490 S.W.3d 117, 126 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Whether a defendant is entitled to a jury instruction on a lesser-included offense involves a two-step analysis. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011). In the first step, we ask whether the offense in the requested instruction is a lesser-included offense of the offense charged. *Id.*; *see* TEX. CODE CRIM. PROC. art.

37.09(1) (listing four circumstances in which offense is lesser-included offense). This is a question of law that does not depend on the evidence produced at trial. *Rice*, 333 S.W.3d at 144. The second step of our analysis is to determine whether the evidence permits a rational jury to find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Id.* at 145. That is, the evidence must establish that the lesser-included offense is a valid, rational alternative to the charged offense. *See Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011). "Anything more than a scintilla of evidence entitles a defendant to the lesser charge." *Id.*

There is no question that the first prong of the test is satisfied. Both manslaughter and criminally negligent homicide are lesser-included offenses of murder. *See Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (manslaughter); *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992) (criminally negligent homicide). We focus on the second prong.

**B.    The trial court did not err by refusing the lesser-included-offense instructions**

The State charged Campbell with murder under two theories: (1) he intentionally or knowingly caused Solis's death by shooting her with a firearm, or, (2) while intending to cause Solis bodily injury, he intentionally or knowingly committed an act clearly dangerous to human life by shooting Solis with a firearm, causing her death. *See* TEX. PENAL CODE § 19.02(b)(1)–(2). The jury charge instructed on both theories. As noted, Campbell was entitled to instructions on the

10

lesser-included offenses only if some evidence in the record would allow a rational jury to find that if Campbell was guilty, he was guilty *only* of manslaughter or criminally negligent homicide.

The key difference between murder, manslaughter, and criminally negligent homicide is the culpable mental state required to establish each offense. Murder is statutorily defined as intentionally or knowingly causing the death of an individual, meaning the defendant must have a "conscious objective or desire" to cause the death or an awareness that the "conduct is reasonably certain to cause" the death. TEX. PENAL CODE § 6.03(a)–(b); *see also id.* § 19.02(b)(1)–(2). In contrast, manslaughter is committed when a person "recklessly causes the death of an individual." *Id.* § 19.04(a). Recklessness involves conscious risk creation; the defendant must be aware of a substantial and unjustifiable risk the result will occur but consciously disregards it. *Stadt v. State*, 182 S.W.3d 360, 364 (Tex. Crim. App. 2005); *see also* TEX. PENAL CODE § 6.03(c). And criminally negligent homicide is committed when a person "causes the death of an individual by criminal negligence." TEX. PENAL CODE § 19.05(a). Criminal negligence involves "inattentive risk creation," meaning the defendant ought to be aware of a substantial and unjustifiable risk surrounding his conduct but fails to perceive the risk. *Stadt*, 182 S.W.3d at 364; *see also* TEX. PENAL CODE § 6.03(d).

11

Applying these definitions, the second prong of the test is satisfied here if there is some evidence from which a rational jury could find that Campbell consciously disregarded or failed to perceive the substantial and unjustifiable risk that his conduct would cause Solis's death, rather than finding that Campbell consciously desired Solis's death or was aware that his conduct was reasonably certain to cause her death.

Campbell contends that this test is satisfied by his own testimony. He points to his testimony that he owned three firearms and kept the Glock pistol "loaded and ready to go" and his recounting of the shooting—specifically, his testimony that the Glock pistol discharged once when he deflected it with his left arm and three more times as he and Solis fought for control of it. He asserts that a rational jury could find from this testimony that he acted recklessly or with criminal negligence when he engaged in "the jostling, the wrestling, the fight back and forth with the weapon," which resulted in Solis accidentally shooting herself, instead of simply fleeing when Solis pointed the gun at him. We disagree.

Campbell's testimony is not evidence of recklessness or criminal negligence. Campbell did not admit to shooting Solis but claimed that, because he feared for his life, he swatted the Glock away as Solis pointed it at him and then struggled with her for control of the gun after she accidentally shot herself the first time, resulting in Solis accidentally shooting herself three more times. As the State points out, the

12

evidence at trial thus presented two scenarios: (1) the State's version, in which Campbell intentionally or knowingly murdered Solis in either of the two manners charged in the indictment; or (2) Campbell's version, in which Solis pointed a loaded gun at him and then accidentally shot herself during the ensuing struggle for the gun when her finger was on the trigger. Campbell's testimony, if believed, would allow the jury to find that he did not intentionally or knowingly shoot Solis, i.e., that he was not guilty. But "mere disbelief of evidence establishing commission of the greater offense is insufficient by itself to justify submission of a [lesser-included-offense] instruction" because "the disbelief of evidence is not evidence." *Chavez v. State*, 666 S.W.3d 772, 777 (Tex. Crim. App. 2023).

To be entitled to an instruction on manslaughter or criminally negligent homicide there must be some evidence that Campbell shot Solis but did so only recklessly or only with criminal negligence. There is none. Whether or not he perceived the risk that someone could be shot during the struggle for the Glock, the risk was not unjustifiable under Campbell's version of events because he was in fear for his life and trying to gain control of the loaded gun Solis had pointed at him. *See* TEX. PENAL CODE § 6.03(c)–(d) (tying respective definitions of recklessness and criminal negligence to conscious disregard or failure to appreciate "substantial and *unjustifiable*" risk result will occur (emphasis added)); *see also Alonzo v. State*, 353

13

S.W.3d 778, 782 (defendant who argues his actions are justified by another's conduct may negate culpable mental state for recklessness).

We therefore conclude there is no evidence that would permit a rational jury to find that, if Campbell is guilty, he is guilty of only the lesser offense of manslaughter or criminally negligent homicide. Accordingly, the trial court did not err in denying Campbell's request for jury instructions on these lesser-included offenses. We overrule Campbell's second and third issues.

## Conclusion

We affirm the trial court's judgment.

Andrew Johnson
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).